## HUNTER *v.* FEILD.

### Opinion delivered July 6, 1914.

1. TRUSTS—CONSTRUCTIVE TRUSTS—SUFFICIENCY OF THE EVIDENCE.—The evidence to establish the existence of a constructive trust in lands, must be clear, positive and satisfactory, and a mere preponderance of the evidence is not sufficient to engraft a trust upon property conveyed by deed containing no recognition of the trust.

2. TRUSTS—CONSTRUCTIVE TRUSTS—SUFFICIENCY OF THE EVIDENCE TO ESTABLISH.—Appellant purchased lands at a foreclosure sale which belonged to the heirs of deceased mortgagor, and the heirs sought to have a constructive trust declared, on the ground that appellant purchased the property for them; *held*, the evidence was not sufficient to establish a constructive trust.

3. TRUSTS—CONSTRUCTIVE TRUSTS—HOW CREATED.—A constructive trust can not be raised, so as to divest the legal estate of the grantee of land, or his heirs, by the subsequent application of the funds of a third person to the satisfaction of the unpaid purchase money.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

STATEMENT BY THE COURT.

Appellees were plaintiffs below in a suit brought to enforce a trust against certain lands in Pulaski County,

formerly owned by their father, Silas Feild, who died in September, 1897, leaving him surviving, in addition to the plaintiffs certain other children and grandchildren. At the time of his death, Silas Feild was the owner of considerable real estate situated in Pulaski, Desha and other counties in this State, indeed he was described as being "land poor," and such appears to have been the case, as he was heavily involved and his lands produced but little income. The complaint alleged, and there was proof tending to show, the following facts: The heirs of Silas Feild agreed that the eldest son, O. B. Feild, should administer upon the estate of his father, and this son duly qualified and acted as such administrator, until the estate had been administered upon and the administrator discharged. That it was agreed the administrator should serve without pay, and that appellant, who was a son-in-law of the intestate, should assist the administrator in all clerical matters and in making the settlements, and that he, too, should serve without pay, yet the administrator appears to have been allowed the statutory commissions. That at the death of the said Silas Feild the lands involved in this litigation were under mortgage to one B. J. Brown, who was demanding the payment of his money. That appellee W. A. Feild applied to his father-in-law, C. Luchesi, and obtained a loan to be made appellant with which he should buy in as trustee for the benefit of his wife, and the other heirs of Silas Feild, the property which was about to be sold under the decree ordering the foreclosure of the Brown mortgage; and, that, pursuant to this agreement, the property was sold by the commissioner of the court to appellant; and that although appellant took the title to the land in his name individually, his purchase and the conveyance to him was as trustee. This sale took place February 6, 1899. That upon the discharge of the administrator, appellant took charge of and exercised general supervision over the affairs of the estate, including lands not embraced in the Brown mortgage, and made sales of these lands and paid the taxes thereon, and the complaint further alleged that appellant

has made no proper settlement of the money he has received and disbursed, and now repudiates his trust and claims to own individually the lands bought by him at the foreclosure sale.

The answer was a general denial of the material allegations of the complaint, and the case presents several sharply defined questions of fact. There are a number of minor contradictions in the testimony, but the record is voluminous, and we shall discuss only those features of the evidence which we regard as controlling in determining the relationship of the parties to each other.

In addition to the evidence stated, appellees offered evidence to the following effect: That the said Luchesi, who was the father-in-law of W. A. Feild, loaned the appellant the money with which to purchase the land, and loaned it upon the understanding that the land should be purchased by appellant as trustee, that after this purchase, certain taxes on the property there sold appellant were paid by the administrator and heirs of the Feild estate, and that appellant stated from time to time he only wanted his money returned with interest thereon and compensation for his trouble in managing the affairs of the estate. And it was testified that appellant explained that he bought the land and took the title to himself individually, and not as trustee, because some of the Feild heirs were minors, and he could dispose of the property to better advantage by taking the title in his own name.

The moving spirits in this litigation appear to have been W. A. and O. B. Feild, who invited all the other heirs to join with them in the institution and prosecution of this lawsuit, but only two of the heirs accepted this invitation, the others declined to take part in it, and were not joined as defendants, and the case proceeded to final decree between appellant and the heirs who were plaintiffs. The case of the plaintiffs depended chiefly upon the testimony of O. B. Feild and W. A. Feild and his father-in-law, Mr. Luchesi, and the other heirs who testified, derived most of their information from these two brothers.

It is undisputed that the loan to Mr. Brown had been past due for some time, and the Feild heirs had defaulted in the payment of interest, and application had been made to several agents, who made loans on real property, for a loan to repay the Brown mortgage, but all of them had declined to make a loan on the lands described in the Brown mortgage in a sufficient sum to pay that mortgage. A few days before the sale, according to the evidence of appellant, he announced his purpose to W. A. and O. B. Feild to make the land bring the debt it secured, or to buy it in himself at the sale, and that his purpose in so doing was to save the remainder of the real estate from a sale under an execution which would issue on the deficiency judgment, if the land failed to bring the debt. Appellant discussed the question of a loan with Mr. Luchesi, and he declined to make the necessary loan on the property described in the Brown mortgage. Luchesi appears to have gone with appellant to the cashier of the Pulaski Trust Company, and to have discussed the loan with that officer, but the point is in dispute as to how the loan was negotiated. Mr. J. F. Lenon, the cashier of the bank, testified that as representative of Coffin & Ragland, he made the loan to appellant, and that later Luchesi bought this loan and had the mortgage transferred to him, and he further testified that he made the loan directly to appellant, and that there was no intimation that he was borrowing the money to use as trustee. A strong circumstance which supports appellant's contention is that he was unable to raise the money to pay off the mortgage by the use of property belonging to the Feild estate, and his loan was made upon the security of the mortgaged property, and the home of appellant in the city of Little Rock, in which the Feild heirs had no interest whatever, and he repaid this loan out of his own funds. Moreover, the negotiations for this loan show the purpose for which it was being made, it being explained that appellant intended to see that the mortgaged property sold for enough to pay the mortgage debt, and that if this was done, and some one else became the pur-

chaser, appellant would not desire this loan made. When
the sale was made, appellant was not the purchaser of all
the lands. O. B. Feild purchased a small tract of the
land, but assigned his certificate to appellant for the
amount of the bid, and the second wife of Silas Feild bid
on and bought a portion of the land. The commissioner
executed his deed to appellant for the lands purchased
by him and testified that no intimation was given to him
that appellant was not purchasing for his own account.
After this, appellant negotiated the sale of lands belong-
ing to the estate, not embraced in the mortgage, and
there appears now to be no question that he fairly ac-
counted for all of the money so received, notwithstanding
the allegations of the complaint to contrary. Immedi-
ately after his purchase appellant declared his willing-
ness to permit the heirs to redeem from him, and this
purpose appears to have been reiterated frequently there-
after, except that, long before any controversy arose
about the title, appellant announced his intention of not
according this privilege to a branch of the family referred
to as the Hobbs heirs.

Appellant testified that just before the suit was be-
gun, the attorney for appellees requested a conference
with him, at which time the attorney stated to appellant
that W. A. Feild would testify he took the money to ap-
pellant at the courthouse to pay for the land. Feild de-
nied making the statement, but his denial was not un-
equivocal, while the attorney did not deny at all that he
had told appellant that Feild had made this statement to
him; and no one now contends that Feild did this. After
considerable negotiations among a number of the mem-
bers of the Feild family, appellant sold to Mrs. Crockett,
one of the plaintiffs, and to Miss Nannie Feild, her sis-
ter, who did not join in the suit, the city residence bought
at the sale. These two sisters had occupied this prop-
erty for some time before purchasing it, and had paid the
rent thereon very irregularly, and it is conceded that the
property was sold to them at considerably less than its
market value, but in none of the negotiations for the

sale of this property was appellant's title and right to convey questioned and the deed was executed on April 24, 1907.

Appellant sold a portion of this Feild land in January, 1902, and another portion in October, 1904, and sold a right-of-way for a levee in 1907, and no one questioned his right to execute these conveyances. And finally on May 18, 1911, he contracted with W. A. Feild to sell him certain portions of this land, and took notes for the purchase money, and this suit was filed two days before the first of these notes matured.

A letter from appellant to O. B. Feild, dated April 1, 1904, was introduced in evidence, a portion of which read as follows:

"Referring to our conversation as to the amount I am out on the property purchased by me at Brown mortgage sale, I estimate that after giving credits, I am shy about $2,000, and if the heirs could pay that amount cash, I would deed the property to them, provided it was done by April 6, as I have a note due on that date which I do not want to renew."

It appears, however, that certain of the Feild heirs contributed to the payment of the taxes for the years 1908, 1909 and 1910, but no such contributions were made by either O. B. or W. A. Feild. Appellant admits the receipt of these contributions on account of taxes, but says at that time he was still extending to certain of the heirs an option to buy back the lands, and these contributions were treated as payments for this option.

Two grandchildren of Silas Feild, who were twins, and were thirty-two years old when their depositions were taken, testified that appellant's purchase had been the subject of numerous family conferences, and that no one claimed for a number of years after his purchase that he had bought as trustee, but that it was understood that he had repeatedly offered the heirs the privilege of repaying him his money and taking the title to the land, but this offer had never been accepted.

This suit was begun on May 17, 1912, and the court found that appellant, in buying the lands, sold under the Brown mortgage, acted as and under the obligations and duties of a trustee for the Feild heirs, and decreed that he held the title as trustee, and confirmed all contracts and sales made by him and ordered an accounting of all his transactions in the matter before the clerk as master. This accounting was had and the master made his report.

*John M. Rose* and *Marshall & Coffman,* for appellant.

1. To establish a trust in the land in favor of the heirs, the evidence must not only preponderate, but must be so positive as to leave no doubt on the subject. This the evidence wholly fails to do. 48 Ark. 168; 11 Ark. 82; 104 Ark. 312; 75 Ark. 446; 105 Ark. 318, and cases cited; 159 S. W. (Ark.) 1111; 101 Ark. 451; 45 Ark. 482; 42 Ark. 503; 41 Ark. 393.

2. Plaintiffs are barred by reason of their long delay in bringing suit. 145 U. S. 368; 143 U. S. 553; 195 U. S. 309; 60 Ark. 50; 25 Cyc. 1155; 58 Ark. 84; 46 Ark. 25.

3. The decree is erroneous because of want of necessary parties. In a suit like this to establish and enforce a trust, all the beneficiaries are necessary parties, and if any refuse to become plaintiffs, they must be made defendants. 39 Cyc. 611-616; 98 Ark. 446.

*O. D. Longstreth,* for appellees; *Grover C. Morris,* of counsel.

1. The evidence is full, clear, decisive and positive that Hunter was acting as the agent of the heirs and administrator, and leaves no doubt of that fact. As such agent he could only purchase for his principals. 73 Ark. 338; 61 Ark. 344; 61 Ark. 575; 42 Ark. 25.

The evidence shows that the money was obtained from Luchesi by arrangement of the heirs and administrator for the specific purpose of purchasing this property for the estate, and that appellant used the money for that purpose. He is a trustee. 19 Ark. 39; 20 Ark. 272.

Hunter's intention at the time he made the purchase will control; and since the evidence shows that that intention was to act for the heirs, he must be declared a trustee. 40 Ark. 62, syl. 5; 12 Am. & Eng. Ann. Cases, 800; 9 *Id.* 248; 5 *Id.* 253.

By levying taxes on the heirs and beneficiaries, and by written reports, appellant continued to recognize them as owners until this suit was brought, thereby allaying suspicion that he was claiming adversely, and thus perpetrating a fraud for which his claims are barred. 73 Ark. 310; 26 Ark. 341; *Id.* 445; 53 Ark. 191.

Finally, it is shown throughout the testimony, both by appellant's admissions and by many exhibits that he repeatedly asserted that when the heirs should pay back the money, he would surrender his claim. 52 Ark. 378.

2. Appellees are not barred by laches. In making this claim counsel overlook appellant's long concealment of his intentions, and that the first notice appellees had that he claimed ownership of the land was in the fall of 1910; that when O. B. Feild took the matter up with him, appellant claimed that "he wanted to do right about it," suggested that he talk to the other heirs, indicated that a compromise could be reached, and that suit was brought in 1912 only after the impossibility of a compromise was demonstrated. None of the cases cited by appellant are analogous to this case on the facts, yet this case falls well within the exception intimated by the court in *Patterson* v. *Hewitt,* 195 U. S. 309, 49 L. Ed. 214, see page 219. In contending that the statute of limitations began to run from the time Hunter bought the land, or the recording of his deed, counsel overlook the doctrine of fraud. 73 Ark. 310-313.

3. The decree is not erroneous for want of necessary parties. All necessary heirs were parties to the suit, either as plaintiffs, defendants or interveners. The failure to abstract the intervention of Helen E. Hobbs and others, and the testimony given under it is alone sufficient to bar appellant's raising the question here. 100 Ark. 328.

If there were heirs not made parties, the decree could only be reversed as to them, and would stand as to the others. 83 Ark. 196; 75 N. Y. S. 70; 70 Ark. 197.

SMITH, J., (after stating the facts). Appellant insists there was a defect of parties in that the court undertook to render a final decree both as to the title to the property, and the accounting for the rents, when a number of the Feild heirs were neither parties plaintiff nor defendant. Appellant also says this action is barred by laches. But we find it unnecessary to consider either of these questions, as we think the chancellor's finding that there was a trust in the land in favor of the heirs of Silas Feild is contrary to the preponderance of the evidence.

Appellees insist that appellant was the agent of the heirs and the administrator, and that as such he could purchase only for his principals, and that the proof shows the money used in the purchase of the lands was secured from Luchesi by an arrangement between the parties for the specific purpose of purchasing for the estate, and that the money was used for this purpose, and that the purchase with this intention made with money raised by appellees for that purpose constituted appellant a trustee, and that he holds the title as such. The reported cases all hold that evidence to establish the existence of such trust must be clear, positive and satisfactory, and some cases say that the evidence must be so clear and positive as to leave no doubt; and all the cases agree that a mere preponderance of evidence is not sufficient to engraft a trust upon property conveyed by deed containing no recognition of the trust. And we think this evidence is not sufficient to meet that requirement. In our opinion as much as can be said of this evidence and its sufficiency (and we do not decide even that), is that appellant proved recreant to his promise to convey this title to the Feild heirs, or to distribute the proceeds of the sale of this property among them.

(1-2-3) The agreement between these parties, if the facts were as appellees contend, is not enforceable as con-

stituting an express trust for the reason that the entire agreement rests in parol. Nor can the evidence in this case be said to constitute a resulting trust because the purchase money was furnished by appellant, and was raised by him through a mortgage which he gave on his own home. This was done after the administrator and heirs had failed in their efforts even to raise the money with which to pay the interest on the mortgage debt. Every one, including Luchesi, to whom application was made for the loan of money, declined to make it upon the security offered, and the entire Feild estate appeared to be imperiled. The mortgage indebtedness, exclusive of interest and costs of suit, was $4,000, and appellant bought only a portion of the property sold at the foreclosure sale, and the property which was bought by him for $2,615, together with the other property sold, brought the amount of the mortgage indebtedness, including the costs and interest, and at the sale there was competitive bidding, and a large part of the property was bought by the widow of Silas Feild, who was also the widow of one of his sons, and the mother of several of the heirs interested in this estate. The exact amount of money which appellant would require could not be known, and was not known until after the sale, when he borrowed from the Pulaski Trust Company the money with which to make his payment. This loan was made to appellant individually upon the use of his individual property as security, and even though an agreement might have existed at the time of this sale to hold the property as trustee for the Feild heirs, such an agreement would not constitute a resulting trust. Discussing this question in the case of *Grayson* v. *Bowlin,* 70 Ark. 145, Mr. Justice BATTLE, speaking for the court, said: "This court, in *Sale* v. *McLean,* 29 Ark. 612, and in *Duval* v. *Marshall,* 30 *Id.* 230, said, in effect, that, in order to create a trust of this nature (resulting trust), payment of the purchase money must be made at the time of the purchase. By this it was meant that the trust must arise, if at all, from the original transaction at the time it takes place, and at no other time; and

that it can not be mingled with any subsequent dealings. Some of the cases use the language, 'at the date of the payment of the purchase money;' others, 'at the time of the execution of the conveyance.' But all of them mean the same thing, namely, that it is impossible to raise a resulting trust, so as to divest the legal estate of the grantee or his heirs, by the subsequent application of the funds of a third person to the satisfaction of the unpaid purchase money. *Botsford* v. *Burr,* 2 Johns. Ch. 406; *Rogers* v. *Murray,* 3 Paige, 390; Leading Cases in Equity, *supra,* 338. The trust arises out of the circumstances that the money of the real purchaser, and not of the grantee in the deed, formed the consideration of the purchase, and became converted into land." And that opinion quoted with approval the following language from the case of *Bland* v. *Talley,* 50 Ark. 71: "Now, a parol agreement that another shall be interested in the purchase of lands, or a parol declaration by a person that he buys for another, without an advance of money by that other, falls within the statute of frauds, and can not give birth to a resulting trust." Nor can it be said that a trust *ex maleficio* arose from the facts of this transaction. The essentials of such a trust were discussed in *Spradling* v. *Spradling,* 101 Ark. 451, in which case it was said: "* * * There is no testimony indicating that the husband fraudulently induced the wife to have the deed made to him by reason of a promise that he would convey the land to, or hold it for, the children. There is no testimony that he acquired the title by any intentionally false or fraudulent promise, so that it could be said that a trust *ex maleficio* arose from the transaction. To create such a trust, the mere verbal promise, and its breach, is not sufficient. There must be some element of fraud practiced whereby the execution of the deed is induced; and in the case at bar, there is not a tittle of testimony indicating that any such fraud was practiced by the husband upon the wife in obtaining this deed. 3 Pomeroy Eq. Jur., § 1056."

Discussing the proof necessary to establish a trust *ex maleficio,* Mr. Justice RIDDICK, in the case of *Ammonette* v. *Black,* 73 Ark. 313, said: ''There must, of course, in such cases be an element of positive fraud by means of which the legal title is wrongfully acquired, for, if there was only a mere parol promise, the statute of frauds would apply.''

Both of the opinions of this court quoted from, cite with approval section 1056, 3 Pomeroy, Equity Jurisprudence, which reads as follows: ''The foregoing cases should be carefully distinguished from those in which there is a mere verbal promise to purchase and convey land. In order that the doctrine of trusts *ex maleficio,* with respect to land, may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the statute of frauds would be virtually abrogated; there must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute; it endeavors to prevent and punish fraud, by taking from the wrong-doer the fruits of his deceit, and it accomplishes this object by its beneficial and far reaching doctrine of constructive trusts.''

It follows from what we have said, the chancellor erred in his finding that appellant held the interest to the property in question as trustee, and in his directions that an accounting be had of the proceeds of the sale and disposition of the trust property, and his decree to that effect will therefore be reversed and the cause remanded with directions to the chancellor to dismiss the complaint for want of equity.

KIRBY, J., dissents.