BARRON *v.* STUART.

Opinion delivered November 11, 1918.

1. FRAUDS, STATUTE OF—TRUSTS EX MALEFICIO.—Kirby's Dig., § 3666, providing that all declarations or creations of trust or confidence of any lands or tenements shall be manifested and proved by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void, etc., has no reference to trustee *ex maleficio.*

2. TRUST EX MALEFICIO—ENFORCEMENT.—Where a testator, being about to die, was induced by one of his sons to leave all his property to his wife and to appoint such son as his executor under an agreement made by such son and acquiesced in by his wife that she would divide his property among his children and grandchildren, such agreement will be enforced after his death; the right of relief being founded on fraud.

3. TRUST EX MALEFICIO—SUFFICIENCY OF EVIDENCE.—Parties seeking relief by enforcing a parol trust *ex maleficio* upon land in the hands of a devisee must establish the trust by clear and satisfactory evidence.

Appeal from Greene Chancery Court; *Archer Wheatley,* Chancellor; reversed.

STATEMENT OF FACTS.

Appellants, who were the daughters and grandchildren of J. W. Stuart, deceased, brought this suit in equity against appellee, who were the sons and the widow of J. W. Stuart, deceased, and the object of the suit was to establish a trust in certain property devised by said J. W. Stuart to his wife, M. R. E. Stuart.

Appellees answered, denying the trust and averring that the property was left to Mrs. M. R. E. Stuart absolutely under the terms of the will.

J. W. Stuart was born in Greene County, Arkansas, and lived there all his life. He was sixty-eight years old when he died, and he and M. R. E. Stuart had lived together as husband and wife for forty-eight years. He left surviving him five sons, two daughters and the children of three deceased daughters. Neither J. W. Stuart, nor his wife, M. R. E. Stuart, were able to read or write, but J. W. Stuart had a strong mind and possessed to a marked degree the ability to make money. At the date of his death he possessed property variously estimated at from $111,000 to $250,000. His property consisted of a number of improved farms, a large tract of wild land, a large number of cattle and horses, a great quantity of corn and cotton, also some wheat, due bills, promissory notes, and a large amount of money deposited with various banks and mercantile establishments in the cities of Paragould and Jonesboro, Arkansas. During the last eight or ten years of his life, his oldest son, J. A. Stuart, signed his name to checks and looked after his business affairs generally. In July, 1916, J. W. Stuart was kicked by a mare, and died in about eleven days thereafter as a result of his injuries. The mare kicked him on Tuesday, the 18th day of July, 1916, and he died on Friday, the 28th day of July following. Two days after J. W. Stuart was hurt his son, J. A. Stuart, went to a justice of the peace and brought him to the house for the purpose of preparing and acknowledging a deed from his father to Ab Stuart, his youngest son. On his way up there the justice of the peace met up with the attending physician, who told him that J. W. Stuart was fatally injured and that he ought to make a will. The justice of the peace prepared the deed and took the acknowledgment of J. W. Stuart thereto as requested. He was then asked to prepare another deed and declined because he had no more blank deeds. The attending physician also told J. A. Stuart that his father was not likely to get well. On Thursday night following the injury the attending physician told J. A. Stuart that he had lost all hope of his father recovering from his injuries. The wife of J. W.

Stuart was in constant attendance at his bedside from the time he was injured until he died. His children and grandchildren, a brother and other relatives were there most of the time after he received his injuries until he died. It was late Thursday night when the attending physician told J. A. Stuart that his father could not recover. J. A. Stuart informed his father and the other children around his bedside that he could not recover. J. W. Stuart broke down and cried when he was told that there was no chance for him to recover from his injuries. After a little while he rallied and began to talk to his children about the disposition of his property. He called over his farms by name and told which one he wanted each of his children to have. He also spoke of the timber lands which he owned and directed how they should be divided. He also directed how the corn and cotton, which was being raised on his various farms that year, should be divided when gathered. He told them how to divide his horses and cattle and the money and other personal property which he possessed. He wanted his wife to keep the home place and certain stock on it and $10,000 in money. His idea seemed to be to divide up his property among his children and to give his wife sufficient to live on in comfort so that she would not have to work any more or be worried with looking after a lot of property. On the next morning it was suggested that he was too weak to be bothered with the details of dividing his property and that he should make a will leaving all his property to his wife and that she could divide it after his death in accordance with the directions which he had already given. Such a will was executed on Friday morning. On their way home, the lawyers who had written the will remembered that it was void under our statutes because the children had not been mentioned in it. They returned again on Saturday and explained this defect to the parties interested. J. W. Stuart was better then, but executed another will, leaving all his property to his wife as in the first one. He died on the following Friday, living only one week after executing the first will. After

his death his wife executed deeds to the various children and grandchildren to the improved farms as had been directed by her husband in his lifetime, but she refused to execute a deed to her daughters and her grandchildren to any of the timber lands or to divide the personal property equally between all the children. She expressed her intention of holding the property absolutely and dividing it among her children as she liked. She denied that she had received the property in trust, but claimed it absolutely as her own under the will. Hence this lawsuit. Other facts will be stated and referred to in the opinion.

The chancellor found that the trust attempted to be established by the will was void under our statute of frauds, and it was decreed that the complaint of appellants should be dismissed for want of equity. The case is here on appeal.

*Self & Patton, Block & Kirsch* and *Huddleston, Fuhr & Futrell,* for appellants.

1. Notwithstanding the statute of frauds, a trust arises where upon making a will, or thereafter a devisee or legatee promises the testator expressly or impliedly, by not dissenting, that he will hold for or give to another the property devised or bequeathed to him, whereby the testator is prevented from making the disposition by will he intends, or is persuaded not to alter a will already made. The true rule is stated in note to 21 Ann. Cas. 1385. This rule has been followed in many cases. 16 Am. Dec. 575; 26 *Id.* 123; 42 Ala. 60; 48 N. J. Eq. 102; 21 Atl. 943; 27 Am. St. 466; 15 W. Va. 567; 47 N. W. 408; 69 Pac. 428; 24 Am. Dec. 413; 16 Atl. 464; 53 N. E. 767; 21 Ann. Cas. 1379. See also Pom. Eq. Jur. (2 ed.), § 1054; 24 Am. Dec. 413; 16 Atl. 464; 53 N. E. 767; 106 Am. St. 94; Perry on Trusts, etc., § 181; 106 Am. St. 94; 84 Ark. 189; 73 *Id.* 310, etc.; 110 *Id.* 389; 109 *Id.* 335; 101 *Id.* 451; 114 *Id.* 128; 113 *Id.* 36.

2. Plaintiffs should recover upon the theory of constructive trusts. Bispham, Eq., § § 91-93; 52 N. E. 58; 61 *Id.* 1040; 73 *Id.* 319; 48 Am. Rep. 640; 17 Pac. 689; 27

*Id.* 186; 14 N. W. 385; 19 *Id.* 691; 37 Am. St. 501; 32 Pac. 171. A fiduciary or confidential relation exists between husband and wife. 74 Pac. 143; 118 *Id.* 430; 71 Atl. 559; 29 N. E. 1116; 30 *Id.* 318; 77 Atl. 797; 88 Am. St. 620; 62 N. E. 666; 131 N. Y. Supp. 891; 120 *Id.* 18; 54 Pac. 352; 39 L. R. A. (N. S.), 925; 73 N. E. 319.

3. When it appears that the testator did not intend for the devisee to take the entire beneficial interest, and no direction is given as to who shall take the beneficial interest, a trust results in favor of the testator's heirs. There is no known principle of law by which a dry trust can be converted into a beneficial estate. Pom., Eq. Jur., § § 1031-2; 1 Perry on Trusts, § § 159-160; 3 Pom. Eq., § § 1031, 981. This case is squarely within the rule of Pom., Eq., § 1031. See also as to this character of trusts, 47 Am. Rep. 53; 26 N. E. 876; 16 S. E. 614.

4. All fraud in this record is imputable to Mrs. M. R. E. Stuart, although she may not have been guilty of any of it. 1 Perry, Trusts, § 172; 2 Pom. Eq. Jur., § 918; 1 Perry, Trusts, § 211; 22 Atl. 191.

5. There has been sufficient performance to take the case out of the statute of frauds. 27 Conn. 335; 56 Ind. 569; 39 L. R. A. (N. S.), 928, note.

6. Appellee did not plead the statute of frauds as a defense. 105 Ark. 638, etc.

*Lamb & Frierson* and *Hawthorne & Hawthorne,* for appellees.

1. The evidence does not sustain the contention that any of the property was ever held by Mrs. Stuart as a trustee. Mrs. Stuart made no promise to convey to the children, nor did she suggest that a will be executed. No trust was created. 73 Ark. 310; 109 *Id.* 335; 101 *Id.* 451; 84 *Id.* 189; 113 *Id.* 36; 110 *Id.* 389; 114 *Id.* 128; 113 *Id.* 279-282; 19 *Id.* 30; 3 Pom. Eq. Jur., § § 1053-1056; 1 Perry, Trusts, § 181; 1 Story, Eq. Jur., § § 256, 192; 2 *Id.,* § 781.

2.   Mere silence or acquiescence was not sufficient to raise a trust.   95 N. Y. 403; 80 Pa. St. 405; 1 Watts, 163; 42 Ala. 60; 62 *Id.* 579; 90 *Id.* 91; 95 *Id.* 541.

3.   There was no constructive trust.   170 S. W. 1021; 98 Ark. 540; 101 *Id.* 451.

4.   The rule announced in 73 Ark. 310-312-13 is a rule of property.   62 Ala. 570 (590).

5.   It was unnecessary to specifically plead the statute of frauds.   19 Ark. 39; *Ib.* 23; 101 *Id.* 460; 49 L. R. A. (N. S.) 1 and note, p. 16.

6.   The question of part performance of an alleged but unenforcible trust is not involved here as no trust arose.   73 Ark. 310.

7.   Laura Barron has no right in law or equity to the wild land claimed.

8.   The decree should be affirmed because (1) there is no foundation for a trust; (2) there was a request that certain farms be conveyed to certain children; (3) there was no request that wild land be conveyed or personal property be distributed, and (4) the conveyance of the farms is not a recognition or part performance of any trust with reference to the wild land and personalty.

HART, J., (after stating the facts).   Section 3666 of Kirby's Digest reads as follows:

"All declarations or creations of trusts or confidences of any lands or tenements shall be manifested and proven by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void; and all grants and assignments of any trusts or confidences shall be in writing, signed by the party granting or assigning the same, or by his last will in writing, or else they shall be void."

Under this section all declarations of trust which are not proved by some writing are void.   But the court has repeatedly held that the statute in question refers to express trusts and has no reference to what are called trusts *ex maleficio,* which are a species of implied or con-

structive trusts which equity impresses upon property in
the hands of one who has obtained it through fraud, in
order to administer justice between the parties. *Am-
monette* v. *Black,* 73 Ark. 310; *Lacotts* v. *Lacotts,* 109
Ark. 335; *Spradling* v. *Spradling,* 101 Ark. 451; *McDon-
ald* v. *Tyner,* 84 Ark. 189; *Ussery* v. *Ussery,* 113 Ark. 36;
*Veasy* v. *Veasy,* 110 Ark. 389; *Hunter* v. *Field,* 114 Ark.
128; *Harbour* v. *Harbour,* 103 Ark. 273.

A clear statement of the rule that a trust *ex malefi-
cio* is not within the prohibition contained in a section of
a statute of frauds similar to our statute is made in
*Church* v. *Ruland,* 64 Pa. 432. At that time that court
was composed of Thompson, C. J., Agnew and Shars-
wood, JJ., all being learned and able judges. Judge
Sharswood delivered the opinion of the court, and in re-
gard to the question under consideration said:

"Indeed it is not easy to see how such a trust ever
could be made out except by parol evidence, and if this
is not competent, a statute made to prevent frauds would
become a most potent instrument whereby to give them
success. That this doctrine is applied to cases arising
under wills where a person procures a devise to be made
in his favor on the distinct declaration or promise that
he will hold the land in trust either in whole or in part
for another may be seen in the cases referred to in 1
Jarman, 356; 1 Story's Equity, par. 256. It is not af-
fected by the statutory provisions on the subjects of wills.
The proof offered is not of any alteration, revocation or
cancellation, which must be evidenced in a particular
manner. It gives full effect to the will and every word
of it, and to the conclusiveness of the probate, where it
is conclusive. It fastens upon the conscience of the
party, having thus procured a will, and then fraudulently
refusing or neglecting to fulfill the promise on the faith
of which it was executed, a trust or confidence, which a
court of equity will enforce by compelling a conveyance
when the proper time for it has arrived; and with us in
Pennsylvania such a conveyance will be considered as
having actually been made, whenever it ought to have

been made. The *cestui que trust* will be entitled to recover in ejectment against the trustee, and all in privity with him. This was decided in *Hoge* v. *Hoge,* 1 Watts, 163, a case fully and ably argued and considered, both by the counsel engaged in the cause and by the court, as appears in the elaborate opinion by Chief Justice Gibson. It was there held that if a testator be induced to make a devise, by the promise of the devisee that it should be applied to the benefit of another, a trust is thereby created which may be established by parol evidence; and, that this is not contrary to the statute of wills. 'It is contended,' said Gibson, C. J., 'that parol evidence of a trust is contrary to our statute of wills, which corresponds as far as regards the point in dispute, with the British statute of frauds. Undoubtedly every part of a will must be in writing; and a naked parol declaration of trust in respect of land devised is void. The trust insisted on here, however, owes its validity, not to the will or the declaration of the testator, but to the fraud of the devisee. It belongs to a class in which the trust arises *ex maleficio,* and in which equity turns the fraudulent procurer of the legal title into a trustee to get at him; and there is nothing in reason or authority to forbid the raising of such a trust, from the surreptitious procurement of a devise.' To the same effect is *Jones* v. *McKee,* 3 Barr 496, S. C., 6 Barr 425, a case the same in principle and very similar in its facts to that presented upon this record.''

Other cases sustaining the rule are the following: *Ransdel* v. *Moore* (Ind.), 53 L. R. A. 753; *Owings' Case* (Md.), 17 Am. Dec. 311; *Gaither* v. *Gaither,* 3 Md. Chy. 158; *Williams* v. *Vreeland,* 32 N. J. Eq. 734; *Trustees of Amherst College* v. *Ritch,* 37 L. R. A. 305; *Gilpatrick* v. *Glidden* (Me.), 2 L. R. A. 662; *Collins* v. *Hope,* 20 Ohio 493; *Towles* v. *Burton,* 24 Am. Dec. (S. C.) 415; *Richardson* v. *Adams* (Tenn.), 10 Yerg. 273; *Brook* v. *Chappell,* 34 Wis. 405; *Robinson* v. *Lewis* (Miss.), 24 Am. St. Rep. 254; *Curdy* v. *Berton,* 5 L. R. A. (Cal.), 189; *Winder* v. *Schotey,* 21 A. & E. Ann. Cas. (Ohio.), 1379,

and note; *Caldwell* v. *Caldwell,* 7 Bush (Ky.), 517;
*Laird* v. *Vila* (Minn.), 106 Am. St. Rep. 420; *Dowd* v.
*Tucker,* 41 Conn. 197; *Ragsdale* v.- *Ragsdale* (Miss.), 11
L. R. A. 316, and *Benbrook* v. *Yancey* (Miss.), 51 So. 461.

So it may be said that in all such cases the right of
relief is founded on fraud; for as said by Lord Eldon in
*Stickland* v. *Aldridge,* 9 Ves. 516, "The statute was never
permitted to be a cover for fraud upon the private rights
of individuals." It is well settled by the above authori-
ties that the parties seeking relief must establish the trust
by clear and satisfactory evidence. It is equally well
established by them that while a promise is essential it
need not be expressly made, for actual co-operation or
silent acquiescence may have the same effect as an ex-
press promise. Applying the principles of law above an-
nounced to the facts of this case, the question is whether
or not appellants have established their case by clear and
satisfactory evidence.

It is contended by counsel for appellees that J. W.
Stuart under the terms of his will left his property abso-
lutely to his wife, and that, on account of his confidence
in her, he placed his whole property within her unlimited
control. They point to the fact that this is not surpris-
ing when it is considered that they had lived together
forty-eight years, and that she was the mother of his
children, having the same interest with himself in mak-
ing provision for their wants. They claim that there is
nothing whatever in her acts or conduct, either before or
after the making of the will, that can be construed as a
fraud upon the rights of appellants. It is true she did
not solicit her husband to make a will in her favor, but
in deciding the question of fraud we must take into con-
sideration the position, condition and relation of the
parties at the time the will was executed.

When told that there was no hope of him recovering
from his injuries, J. W. Stuart at first broke down and
wept. But he soon recovered and began to talk about
how he wanted his property disposed of. He had talked

at various times about making a will and disposing of his property but had neglected to do so. His wife and children were around his bedside. He began to discuss the disposition of his property, and mentioned what improved farms he wanted his children and grandchildren to have. He then told how he wanted his timber lands divided and took up his personal property in detail and provided for a division of that. He recognized that his wife had been a hard-working woman, and seemed to wish to give her such an amount of his property as would support her comfortably and would entail upon her but little care and labor in looking after it. Hence he decided to give her the home place and sufficient personal property to stock it and some money. It was first thought that $4,000 would be sufficient, but upon the suggestion of his brother it was made $10,000. His mind continued to dwell upon a division of his property until the next day when he was told by his son, J. A. Stuart, that he was too weak to make a division of his property among his children, and that it would be best to make a will leaving all his property to his wife, and that she could make the division in accordance with the directions he had already given. His mind at that time was necessarily greatly weakened as the result of his injuries. He had been accustomed for the past eight or ten years to rely upon his son, J. A. Stuart, as to the legal forms necessary to the transaction of his business. He even signed all of his checks. Under such circumstances, it was natural that he would rely upon his son as to the best method of disposing of his property in his weakened condition. He had already told his children in the presence of his wife how he wanted his property divided, and they all perfectly understood his wishes in the matter. He was induced by the confidence he had in his son and his wife to make a will in which he left all of his property to his wife and made his son his executor. When asked in the course of the preparation of the will as to who should be named as executor, he readily named his son, J. A. Stuart. When he was asked as to whether his son, J. A.

Stuart, should give bond, he first hesitated and then said that it would be fair to the other children to require him to give bond. Both before and after the will was executed, he expressed confidence that his wife and J. A. Stuart would carry out his wishes in the division of his property and told his children that there was enough property for all of them. He spoke of his grandchildren in the same connection, and repeatedly said a child was a child, meaning no matter whether it was a child of his own or a child of his children. His wife was constantly at his bedside and acquiesced in the arrangement. She did not actively do anything to induce her husband to make the will in her favor, but her acquiescence under the circumstances amounted to action. She knew that her favorite son, J. A. Stuart, first suggested the will, and that he was extremely anxious that it should be made, even though the attending physicians at first advised against the making of the will and only consented that J. W. Stuart might make it provided it was a short will, leaving all his property to his wife. After her husband's death, Mrs. Stuart in all things acted upon the advice of her son, J. A. Stuart. She prepared the deeds to the improved farms in accordance with the directions of her husband and finally delivered them to all the children, including the grandchildren, but took no further steps looking to a division of the property. J. A. Stuart after his father's death told his sisters that they might induce his mother to make a will leaving out the grandchildren in the disposition of the personal property. Subsequently he had a row with his sisters and determined to leave them out in the division of the timber lands. Mrs. Stuart acted throughout in conjunction with J. A. Stuart and in obedience to his wishes, no matter what came up. The testimony is very extensive, and we have not attempted to set it out in detail. There is little dispute among the witnesses, however, in regard to this point.

A careful consideration of the whole record convinces us that it was established by clear and satisfactory evidence that J. W. Stuart was induced by the promise

of his wife, coupled with the suggestion of his son, that a devise of all his property to her was a prudent plan in his weakened condition of securing a division of all his property among all his children. To hold otherwise would allow her to take a fraudulent advantage of the weakness and necessities of her husband. It does not make any difference that she intended that the fraudulent advantage secured should be for the benefit of her son, instead of herself.

It is also contended that it was not established by clear and satisfactory evidence that J. W. Stuart declared his intention of dividing his money and other personal property among all his children, including his grandchildren. There was testimony tending to show that he intended to divide his money and other personal property between his living children, but we do not deem it necessary to comment at length on the testimony in this respect. We think it clear from all the evidence that the testator intended that his property should be divided among all his children, and that he intended that his grandchildren should take the part which would have gone to their deceased parents, had they been living. Both before and after he made his will J. W. Stuart told his children and other friends and relatives who had gathered about him that he had made his will and had made provision for all his children, that there was enough property for all, and that a child was a child, meaning thereby whether that child was living or dead.

The decision of the chancellor seems to have proceeded upon the theory that the principles of law above announced are in conflict with our earlier decisions bearing on the question; and this is the contention of counsel for appellees. We do not think this position is sound. We have carefully examined our previous decisions on the subject, and find them to be in harmony with the views herein expressed, and the rule has been variously applied according to the facts in each case. In *McDonald* v. *Hooker,* 57 Ark. 632, the court held that oral proof can not be heard to engraft an express trust upon a deed

absolute in terms. There a few days before his death the grantor without consideration conveyed his lands by deed to his son-in-law. He was not induced to do so by any promise made by the son-in-law to hold the lands in trust for the other heirs of the grantor nor did he acknowledge or declare that he held the lands in trust for them. In *Ammonette* v. *Black,* 73 Ark. 310, a mother conveyed her lands to her son. The son by will left the lands to a grand-daughter of his mother and her daughter. A nephew brought suit, asking that a trust be declared in his favor. It was shown by him that the son, after ascertaining that his mother intended to devise the lands to her grandson, in order to frustrate her intentions, told her that wills were easily overthrown and advised her that the best way to accomplish such a purpose was to convey the lands to him and that he would either convey or devise the lands to his nephew, her grandson. The court held that this testimony, standing alone, was sufficient to constitute a trust *ex maleficio.* Relief was denied the plaintiff, however, on the ground that the evidence introduced in his behalf had been overcome by the evidence in behalf of the defendant. Thus it will be seen that this case clearly recognizes the rule we have laid down in the present case.

So, too, in *McDonald* v. *Tyner,* 84 Ark. 189, the rule herein announced was expressly recognized. In that case a guardian was short in his accounts with his wards and financially embarrassed in other ways. Two of the sureties on the guardian's bond insisted upon his conveying his property to the sureties to indemnify them, and he agreed to do so. One of the sureties had a deed prepared conveying the property to himself, and said that he had purchased it from the guardian after declining to take it in trust for the sureties. On the other hand, the guardian testified that there was no change in the agreement, but only a change in the form of the transaction; that the deed was made by him to the surety to hold the property in trust for himself and the other sureties. The court said that, if it was a sale, as contended by the

surety, the evidence justified it in being held in fraud of creditors. The court further said that, if it was not a sale, then it was fraudulently obtaining a title in form of a sale to himself when in fact it was to be in trust for all the sureties on the guardian's bond; that this being accomplished by fraud constituted him a trustee *ex maleficio,* instead of a trustee of an express trust, and took the case out of the statute of frauds.

Again, in *Spradling* v. *Spradling,* 101 Ark. 451, the land was inherited by the wife from her father, and by agreement upon the part of the wife, without any inducement on the part of her husband, in the division of the land of her father among his heirs, a deed was made to her husband to her part of the land. The majority of the court held that the evidence showed that the wife made a gift of the land to her husband without any improper influence upon his part, and without any intention that he should hold for her benefit. In that case it was claimed that a trust *ex maleficio* arose from the transaction. The court held that there was no testimony indicating that the husband induced the wife to have the deed made to him by reason of a promise that he would convey the land to or hold it for her children. Thus it will be seen that the rule laid down in the present case was expressly recognized by the court in that case. This is shown by the dissenting opinion in that case. The dissent was not based upon the fact that there was an implied or constructive trust arising by operation of law by reason of the fraudulent conduct of the husband in procuring a deed to be made to himself or his wife's land by promising to hold the land for his wife's children by a former husband, but the dissent was based upon the ground that the facts created a resulting trust within the rule laid down in *Leslie* v. *Bell,* 73 Ark. 338.

In the case of *Ussery* v. *Ussery,* 113 Ark. 36, Foster conveyed eighty acres of land to J. M. Ussery, who had married his daughter, Stella. According to the testimony of Foster, no inducement was offered by Ussery for him to execute the deed, and he was not even present

when the deed was executed. Mrs. Foster testified that there was an understanding that Ussery and his wife would move on the land and build a house on it, and that she and her husband would move on an adjoining tract so that they could be near each other. The court properly held that her testimony was not sufficient to warrant the trial court in declaring the existence of a trust *ex maleficio*.

The views we have expressed herein were recognized in *Davis* v. *Sparks,* 135 Ark. 412; but the facts were found not to bring the case within the rule.

It follows from the views we have expressed that the decree must be reversed, and the cause will be remanded for further proceedings in accordance with this opinion.

HART, J., (on rehearing). It is strongly insisted by counsel in their argument on their motion on rehearing that the opinion of the court is contrary to the rule laid down by Professor Pomeroy and by the decisions of our own court. They refer particularly to Pomeroy's Equity Jurisprudence (3 ed.), vol. 3, § 1054, and *Ammonette* v. *Black,* 73 Ark. 310. We do not agree with counsel in their contention, but on the other hand think the opinion is in exact accord with the rule laid down. We recognize the rule to be that, in order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. However, in the application of the rule, it is well settled that if the testator is induced to make a will by a promise, express or implied, on the part of the legatee that he will devote his legacy to a certain lawful trust, a secret trust is created, and equity will compel him to apply property thus obtained in accordance with his promise. *Trustees of Amherst College* v. *Ritch* (N. Y. Court of Appeals), 37 L. R. A. 305, and cases cited in our original opinion. In the last mentioned case the court said:

"The trust springs from the intention of the testator and the promise of the legatee. The same rule applies to heirs and next of kin who induce their ancestor or relative not to make a will by promising, in case his property falls to them through intestacy, to dispose of it, or a part of it, in the manner indicated by him. *Williams* v. *Fitch,* 18 N. Y. 546; *Grant* v. *Bradstreet,* 87 Me. 583; *Gilpatrick* v. *Glidden,* 81 Me. 137, 2 L. R. A. 662. The rule is founded on the principle that the legacy would not have been given, or intestacy allowed to ensue, unless the promise had been made; and hence the person promising is bound in equity to keep it, as to violate it would be fraud. While a promise is essential, it need not be expressly made, for active co-operation or silent acquiescence may have the same effect as an express promise. If a legatee knows what the testator expects of him, and, having an opportunity to speak, says nothing, it may be equivalent to a promise, provided the testator acts upon it. Whenever it appears that the testator was prevented from action by the action or silence of a legatee, who knew the facts in time to act or speak, he will not be permitted to apply the legacy to his own use when that would defeat the expectations of the testator. As was said by this court in the *O'Hara case,* 95 N. Y. 403, 47 Am. Rep. 53: 'It matters little that McCue did not make in words a formal and express promise. Everything that he said and everything that he did was full of that interpretation. When the testatrix was told that the legal effect of the will was such that the legatees could divert the fund to their own use, which was a statement of their power, she was told also that she would only have their honor and conscience on which to rely, and answered that she could trust them, which was an assertion of their duty. Where in such case the legatee, even by silent acquiescence, encourages the testratrix to make a bequest to him to be by him applied for the benefit of others, it has all the force and effect of an express promise.' The trust does not act directly upon the will by modifying the gift, for the law requires wills to be wholly in writing, but it acts

upon the gift itself as it reaches the possession of the legatee, or as soon as he is entitled to receive it. The theory is that the will has full effect, by passing an absolute legacy to the legatee, and that then equity, in order to defeat fraud, raises a trust in favor of those intended to be benefited by the testator, and compels the legatee, as a trustee *ex maleficio,* to turn over the gift to them. The law, not the will, fastens the trust upon the fund, by requiring the legatee to act in accordance with the instructions of the testator and his own promise. Neither the statute of frauds nor the statute of wills applies, because the will takes effect as written and proved; but, to promote justice and prevent wrong, the courts compel the legatee to dispose of his gift in accordance with equity and good conscience.''

It has also been said that the character of the fraud which justifies the equitable interference consists, ''in the attempt to take advantage of that which has been done in performance or upon the faith of the agreement, while repudiating its obligation under cover of the statute.'' *Glass* v. *Hulbert* (Mass.), 3 Am. Rep. 418; *Curdy* v. *Berton* (Cal.), 12 Am. St. Rep. 157; *O'Hara* v. *Dudley* (N. Y.), 47 Am. Rep. 53; *Towles* v. *Burton* (S. C.), 24 Am. Dec. 409; *Shultz's Appeal,* 80 Penn. 396, and *Stahl* v. *Stahl* (Ill.), 2 A. & E. Ann. Cas. 774, and note.

In the present case the execution of the will was secured by reason of the confidential relations existing between J. W. Stuart, deceased, his wife and his son, Jas. A. Stuart, while the testator was in contemplation of death. It was established by clear and convincing testimony that, after J. W. Stuart was informed by his son, Jas. A. Stuart, that the doctors thought that he was going to die, his mind began to dwell upon a disposition of his property. He called his children and grandchildren around him, and told them that he had enough for all, and that he intended for his property to be divided equally between them. He began to designate the different tracts of land that he wanted each child to have, and specifically stated to them his intended disposition

of all his real and personal property.   He was persuaded
by his son, Jas. A. Stuart, to make a short will leaving
all his property to his wife with the son as executor
under the belief that she would dispose of it after his
death in accordance with his expressed intention.   It is
true that she never made an express promise to him that
she would carry out his wishes in the matter of the dis-
position of his property in order to induce him to make
a will in her favor, but she knew that her favorite son was
making such promise in order to induce him to make the
will, and she acquiesced in his conduct, knowing that her
husband relied upon her carrying out his wishes with
respect to a division of his property.   After he had made
the will, he repeatedly told his children, grandchildren
and friends who gathered about him that his wife and
son, James, knew how he wanted his property divided
and that he could trust their honor and conscience in the
matter.   The record clearly shows that the will was made
in favor of Mrs. Stuart for the purpose of securing a
distribution of the testator's estate between his wife, his
children and grandchildren, and that the acts and conduct
of his wife and favorite son and the confidential relations
existing between them induced the testator to believe that
he had carried out his heart's desire and provided for all
those whom he loved best and recognized as objects of
his bounty.   Under the circumstances as pointed out in
our original opinion, the acts and conduct of the wife
amounted to action on her part in inducing her husband
to make the will.   The distinction we have attempted to
make in the opinion is clearly pointed out by Sharswood,
J., one of the ablest of American judges, in *Schutz's
Appeal*, 80 Penn. 396.   In that case a testator wishing
to bequeath his estate to charitable uses was told that it
would be invalid if he should die within a month, but that
he might give it immediately to some person whom he
could trust to carry out his wishes.   An absolute bequest
was made to Reuben Yeakle.   Yeakle was not present
when the will was made and did not know of its existence
until after the death of the testator.   The testator died

within a month after the will had been made and the court said that under the circumstances there was nothing to fasten a trust upon Yeakle. The learned justice said, however, "Had Reuben Yeakle been present when the will was executed, or the object of the bequest been communicated to him before the testator's death, and he had held his peace, there would have been some ground for fastening a trust upon him *ex maleficio*, as in *Hoge* v. *Hoge,* 1 Watts, 163. But nothing of that kind can be pretended here."

It follows that the motion for rehearing will be denied.

SMITH, J. (concurring). I concur in the opinion in this case, because the widow is seeking to enforce the will and has not, at any time, attempted to elect to take under the statute, and not under the will. Here an estate worth possibly a quarter of a million dollars and wholly a new acquisition has been disposed of by a will which gave the widow—an old woman—"sufficient to live on in comfort so that she would not have to work any more or be worried with looking after a lot of property."

The lawmakers have wisely taken into account the emotions and considerations which influence and sway human conduct and have given the wife the absolute right to elect to take under the husband's will or to take under the statute, as if there were no will. And, in order that opportunity for deliberate reflection may be afforded she is given eighteen months after the death of her husband within which to decide. Section 2715 Kirby's Digest.

Mrs. Stuart sat by the bedside of her husband and watched his life flow away. It was her chief concern to do what she could to assuage the expiring agony of him who had been her companion for forty-eight years, and the law imposed on her no duty to remonstrate with her dying husband that she was not being given by the will what would otherwise be her share.

The husband can not, by will, create a trust which disposes of property which, without the will, would go

to the wife, and thereby deprive her of her rights under the law. It is immaterial, therefore, that she did not protest to her husband that he was depriving her of the interest in his estate which the law would have given her in the absence of the will. It would have been equally immaterial if, instead of remaining silent, she had spoken and had given her assent to the disposition of the estate then proposed. Her right of election is absolute and can not be defeated by any act of hers before the will becomes effective as such by the death of her husband.

No doubt the trust could be enforced *pro tanto* even though there had been an election; but these questions passed out of the case when the right of election expired, and as that right no longer exists, I concur in the opinion and judgment of the court.