## AMMONETTE *v.* BLACK.

Opinion delivered December 10, 1904.

TRUST EX MALEFICIO—WHEN CREATED.—Under Sandels & Hill's Digest, section 3480, providing that declarations or creations of trusts shall be manifested by writing or else they shall be void, and section 3481, *ib.*,

providing that trusts arising by implication of law shall not be affected by the preceding section, a trust arises by implication of law whenever a person acquires the legal title to land by means of an intentionally false and fraudulent verbal promise to hold the same for a specified purpose, and, having thus obtained the title, he retains and claims the property as absolutely his own.

Appeal from Nevada Chancery Court.

JOEL D. CONWAY, Judge.

Affirmed.

### STATEMENT BY THE COURT.

In 1890 Rebecca Ammonette was the owner of certain lands lying partly in Hempstead and partly in Nevada counties. In 1890 she conveyed by two deeds these lands to her son, B. F. Ammonette, Sr. Mrs. Ammonette died in 1891, and her son died in 1898. He left a will by which he devised the lands in question to his niece, Mary E. Black, a granddaughter of Mrs. Ammonette, and to Annie Pearl Black, a daughter of Mary E. Black. In January, 1901, B. F. Ammonette, Jr., a grandson of Mrs. Ammonette and a nephew of B. F. Ammonette, Sr., brought this action against Mary E. Black and Annie Pearl Black. He alleged that he had been reared by his grandmother, and that she had great affection for him, and that she had intended to devise him the lands in question at her death. That she frequently stated that she was willing for her son, B. F. Ammonette, Sr., to have the lands for and during his life, but that after his death she desired that the lands should go to the plaintiff. That B. F. Ammonette, Sr., desiring to thwart the purposes of his mother in order that he might bestow the lands upon the defendants, Mary E. Black and Annie Pearl Black, by threats and menaces sought to compel his mother to convey the lands to him, but, though she was old and infirm, she refused to do so until he falsely and fraudulently promised her that if she would convey the lands to him he would at his death devise them to the plaintiff. That, in consideration of said promise, Mrs. Ammonette refrained from making a will, and conveyed the lands to her son by absolute deed, who at his death devised them to the defendants. He alleges that the defendants had paid nothing for the

lands, and that, by virtue of the fraudulent manner in which B. F. Ammonette, Sr., obtained such lands, he became a trustee for plaintiff, and that in equity plaintiff is the owner thereof. He therefore asked that the title be divested from defendants, and vested in plaintiff, and for other relief.

The defendants appeared, and filed an answer, admitting that Mrs. Ammonette conveyed the lands to her son, and that he devised them to defendants; but denying the other material allegations of the complaint.

On the hearing the chancellor found in favor of defendants, and dismissed the bill for want of equity. Plaintiff appealed.

*McRae & Tompkins,* for appellant.

Resulting trusts are not within the statute of frauds, or covered by Sand. & H. Dig. § 3481, and appellant was entitled to the declaration of such a trust. 1 Sumn. 1; 9 Ark. 525; 40 Ark. 67; 45 Ark. 476; 70 Ark. 150; 95 N. Y. 405, s. c. 47 Am. Rep. 53; 20 L. R. A. 465; 11 *Ib.* 316; 1 Dan. 424; 5 So. Rep. 572; 26 Am. Dec. 56; 1 Ark. 391; 90 Am. Dec. 969. The evidence sustains the contention of appellant, and the absence of the testimony of appellee, Mary Black, raises a strong presumption against her. 48 Ark. 498; 33 Ark. 91.

*M. W. Greeson,* for appellees.

If there was an agreement made by B. F. Ammonette, Sr., to will this property to appellant, it would have created an express and not a resulting trust, and, being oral, it was void. Sand. & H. Dig., § 3480; 45 Ark. 483; 50 Ark. 71; 57 Ark. 637.

RIDDICK, J., (after stating the facts.) This is an appeal from a judgment refusing to declare that certain lands conveyed to B. F. Ammonette, Sr., by his mother, and which he afterwards devised to the defendants, were held by the said Ammonette under a trust for the benefit of plaintiff.

Counsel for appellee contends that, admitting the facts alleged by plaintiff to be true, yet under our statute, which provides that all declarations of trust shall be proved by some writing or else be void, no trust can arise in this case, for there was no writing. Sand. & H. Dig., § 3480. But the statute in question

refers to express trusts, and has no reference to what are called trusts *ex maleficio,* and which are a species of constructive trusts which equity impresses upon property in the hands of one who has obtained it through fraud, in order to administer justice between the parties. "A second well-settled and even common form of trusts *ex maleficio*," says Prof. Pomeroy, "occurs whenever a person acquires the legal title to lands by means of an intentionally false and fradulent verbal promise to hold the same for a certain specified purpose—as, for example, a promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like—and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement." 2 Pomeroy's Equity, § 1055. There must, of course, in such cases be an element of positive fraud by means of which the legal title is wrongfully acquired, for, if there was only a mere parol promise, the statute of frauds would apply. 2 Pom. Eq. § 1056. See also Sand. & H. Dig. § 3481.

Now, in this case, if it was clearly shown that B. F. Ammonette, Sr., the uncle of plaintiff, after ascertaining that his mother intended to devise these lands to her grandson, the plaintiff, and desiring to frustrate her intentions, told her that wills were easily overthrown, and advised her that the best way to accomplish such a purpose was to convey the land to him, and that he would either convey or devise the land to plaintiff—if in this way, his mother being old and infirm, he fraudulently induced her to convey the land to him, he intending at the time to dispose of it in a different way, we should feel little doubt that the finding and judgment should be in favor of plaintiff.

But we have read this evidence carefully, and it impresses us with the belief that plaintiff has not made out his case. If we looked to the testimony of plaintiff and his witnesses alone, we might come to a different conclusion, but their testimony is contradicted in several important particulars.

Plaintiff and some of his witnesses, who are near relatives of his, testify that, in order to force his mother to execute this deed, B. F. Ammonette, Sr., "began a course of harsh and cruel treatment to her and his sister, Penelope, getting full of whisky and cursing and abusing them until their lives were made miserable." But this testimony is contradicted by several disinterested witnesses. Among them was one who had been the family physician for over twenty years. He testified that he resided within a mile and a half of the home of Mrs. Ammonette and son, B. F. Ammonette, Sr., who was a bachelor. After the death of his father, Ammonette came and took charge of the home place, and supported his mother and the family. The witness says that he was intimately associated with them, and knew that B. F. Ammonette, Sr., was uniformly kind to his mother, and that "she could not have been treated better." Tenants and servants who lived on the place testify to the same facts, and a consideration of this evidence convinces us that this charge of harsh and brutal treatment is fully disproved.

Again, the statement of plaintiff, considered by itself, is a little unreasonable. He says that his uncle first attempted by harsh treatment to force Mrs. Ammonette to convey the property, but, failing in that, he induced plaintiff to use his influence with his grandmother to persuade her to make the conveyance, and that he did so on the promise of his uncle that he would devise the property to him. At this time plaintiff was 32 years of age, was justice of the peace, and had studied law. He prepared the deed from his grandmother to his uncle, and says that he fully understood their effect. The deeds were acknowledged before him as justice of the peace, and yet, though he says that his uncle obtained the conveyance by a promise that he would hold only a life estate and devise the land to plaintiff at his death, it does not seem that he made any suggestion that the deeds should be so drawn as to carry this intention of his grandmother and his uncle into effect. If he knew that his grandmother intended that his uncle should only take an estate for life, and desired that the remainder should vest in him, why did he not so prepare the deeds as to protect his interest in the land? The testimony tends to show that he was a man of average intelligence, with some knowledge of the law, and the fact that he drew these deeds so as to vest an absolute

estate in his uncle, with no mention of the remainder which he now says was promised to him, tends very'strongly to overthrow his theory of the facts.

Again, these two deeds were executed in 1890. Mrs. Ammonette died in 1891, and her son in 1898. When plaintiff was asked if he had ever suggested to his uncle that he make provision to carry out his promise, he said that he talked to him about it the same year he died, and that his uncle gave him to understand that he had already willed it to the defendant and her child. If, when he learned that his uncle did not intend to carry out his promise, he had at once brought an action to have the trust declared, a court of equity would be more inclined to listen to his suit. But he waited eleven years after these deeds were executed, and until the lips of his uncle, the most important witness for defendants, were stilled by death. It ought to take a very clear showing to entitle him to relief under such circumstances, and, without discussing the evidence further, we will say that it is not sufficient. We have reached this conclusion without any consideration of the fact that this record is incomplete. Certain letters were introduced in evidence to contradict defendant. They do not appear in the transcript of the evidence. As the appellee makes no reference to them in his brief, they were probably of no great importance, but their absence makes it all the clearer that the judgment should be affirmed, and it is so ordered.