### O'CONNOR *v.* PATTON.

### Opinion delivered July 5, 1926.

1. ADOPTION—ORAL CONTRACT.—Although an oral contract to adopt a child, not legally executed, where the child has fulfilled its part of the contract, may be enforced where the foster parent dies intestate, such a contract does not defeat the latter's disposition of his property by will to others.

2. ADOPTION—BURDEN OF PROOF.—The burden is on the person claiming the benefit of an alleged contract for adoption to establish it by clear, cogent and convincing evidence.

3. WILLS—AGREEMENT TO MAKE.—An enforceable contract to will property to one agreed to be but never legally adopted was not created by a promise that he would inherit property if he would return to the promisor's home and live with him, where the promisee did not comply therewith.

4. EQUITY—MAXIMS.—In equity it is a maxim that he who comes into equity must come with clean hands, or, as otherwise expressed, he that has committed iniquity shall not have equity.

5. EQUITY—CLEAN HANDS.—A young woman, who became engaged to an old man before divorce from her first husband and married him four days after her divorce, but refused to live with him, *held* not entitled to relief in equity against an antenuptial conveyance by him as intended to deprive her of her marital rights.

6. DEEDS—CONSIDERATION.—As between the parties to deeds and their privies, the consideration thereof or the fact that they were voluntary conveyances is immaterial.

7. PROPERTY—DISPOSITION.—The owner of property who is *compos mentis* may dispose of it as he sees fit, so long as he does not interfere with the existing rights of others.

8. TRUSTS—PAROL EVIDENCE.—An express trust cannot by parol evidence be ingrafted upon a deed absolute in form.

9. TRUSTS—FRAUD IN PROCUREMENT OF DEED.—Where there is fraud in the procurement of a deed, the conveyance may be shown to create a trust, though the deed is absolute on its face.

10. TRUSTS—CONSTRUCTIVE TRUST.—To establish a grantee as a trustee *ex maleficio*, there must be something more than a mere verbal promise, however unequivocal; otherwise, the statute of frauds would be virtually abrogated.

11. VENDOR AND PURCHASER—OPTION TO REPURCHASE.—An option to repurchase, given to the grantor some time after the conveyance, and not exercised by him before his death, *held* to be personal, and not to inure to the benefit of his devisees.

Appeal from Ouachita Chancery Court, Second Division; *A. L. Hutchins*, Chancellor on exchange; reversed.

*Smith & Little, Jones, Buck & Gibson* and *U. A. Gentry*, for appellant.

*H. E. Meek* and *L. B. Smead* and *J. N. Saye*, for appellee.

WOOD, J. A. H. Patton executed two deeds dated February 25, 1924. In one of these deeds he conveyed to Dan O'Connor certain lands in Ouachita County, consisting of about 600 acres. By the other deed he conveyed to Dan O'Connor an undivided half interest in about 240 acres, all situated in Ouachita County. The consideration named in both of the above deeds was "$1. and other valuable considerations." This action was instituted by Ellen E. Patton in the Ouachita Chancery Court against Dan O'Connor and certain other parties named as the heirs-at-law of A. H. Patton, deceased. She alleged that A. H. Patton died in June, 1924, testate, without issue, and that she was his widow; that, on or before March 1, 1924, A. H. Patton executed the deeds above mentioned to O'Connor for the purpose of defrauding her. She alleged that her husband, A. H. Patton, had instituted a suit for divorce against her, and that, while this suit was pending, he conveyed the lands mentioned by warranty deed to O'Connor, with the understanding that O'Connor was to hold the same in trust for A. H. Patton until the divorce suit was terminated, and that O'Connor was then to reconvey the lands to

A. H. Patton; that, before the divorce suit was terminated, Patton died. She alleged that she was entitled to a half interest in the lands in fee simple; that A. H. Patton, prior to his death, executed a will in which the plaintiff, Mrs. Sallie Reynolds, Louis Patton and Walter Patton are named as beneficiaries. She alleged that she elected to renounce the will and take her estate as the widow of A. H. Patton. She prayed that the deeds of Patton to O'Connor be canceled and that she be declared the owner in fee simple of an undivided half interest in the lands mentioned.

O'Connor answered, and denied that the deeds mentioned in the complaint were executed on March 21, 1924, and alleged that they bore the true date of their execution. He denied the allegations of fraud, and denied that he held the deeds in trust for Patton. He alleged that on March 21, 1924, he executed and delivered to A. H. Patton the following instrument: "That whereas, on February 25, 1923, A. H. Patton, by warranty deed, conveyed 588.21 acres of land in consideration of $1 and other valuable considerations to Dan O'Connor; that said lands are described in a deed now of record executed by A. H. Patton to Dan O'Connor on February the 25, 1924, and on said day the said A. H. Patton executed to Dan O'Connor a deed conveying an undivided one-half interest in 237.27 acres, in consideration of $1 and other valuable considerations, that said deed is now of record. And whereas, it is understood by and between the said Dan O'Connor and his wife, Anna O'Connor, and A. H. Patton, grantor in said deeds, in consideration of $500 and other considerations when the same is paid to the said Dan O'Connor by the said A. H. Patton, that the said land will be reconveyed to the said A. H. Patton by the said Dan O'Connor and his wife, Anna O'Connor, their heirs and assigns. (Signed) Dan O'Connor, Anna O'Connor. In witness whereof we set our hands on this 21st day of March, 1924. J. L. Diffie, notary public."

O'Connor alleged that there was no consideration for the above instrument, and in the alternative, if the

instrument was held to be valid, that the same was personal to A. H. Patton, but, if held otherwise, then neither the plaintiff nor any one claiming under A. H. Patton had tendered to the defendant the amount mentioned in the option, and that the defendant therefore withdrew the option. He denied any charge of conspiracy to defraud the plaintiff, and denied that she had any interest in the land.

Louis Patton, Walter Patton and Mrs. Sallie Reynolds filed separate answers to the complaint, and, among other things, they admitted that Patton died at Hot Springs, Arkansas, in June, 1924, testate, and named Louis Patton and the plaintiff as beneficiaries. They denied that they had conspired with O'Connor to defraud the plaintiff of any interest in the land, and denied that she was entitled to a half interest therein. With that exception they adopted the complaint of the plaintiff as cross-allegations on their part against their codefendant, O'Connor, and asked that the deeds to him be canceled and that they be declared entitled to take as devisees under the will.

Louis E. Patton filed an intervention in which he denied that A. H. Patton died without issue and testate, and denied that the plaintiff was entitled to an undivided half interest in the lands. He alleged that he was the adopted son of A. H. Patton, and, as such, was entitled to inherit all of his property. He adopted as his own the allegations of the complaint that the deeds to O'Connor were without consideration, and alleged that O'Connor held the same in trust for A. H. Patton. He alleged that the will of A. H. Patton was void, and pleaded in the alternative that, if the court should hold the same valid, he be allowed to take half of the lands as one of the devisees under the will. He also alleged that, if the court should hold that the deeds to O'Connor were valid, the option given by O'Connor to Patton would inure to his benefit as the heir of Patton. He asked that he be allowed to exercise the option. He alleged that the plaintiff, Ellen E. Patton, was entitled to a dower

interest in the lands described, and he prayed that the deeds be canceled and that the dower be assigned her, and that his title be declared and quieted. He made an exhibit to his intervention what purported to be the last will and testament of A. H. Patton, as follows: "This, my last will and testament. I want any money, if any, or land or any other property whatsoever to be divided equally between Walter and Louis Patton, and I want my wife, Ellen, to have $1 and Sallie Reynolds $2,000."

A separate answer was filed by all the other parties to the intervention of Louis E. Patton, in which they denied that he was the adopted son of A. H. Patton and all other allegations. The defendant, Dan O'Connor, denied that the intervener was entitled to exercise the option executed by O'Connor to A. H. Patton. The deeds and "option" mentioned in the pleadings were introduced in evidence. Also certain other deeds, by agreement, were introduced in evidence, and the will of A. H. Patton and the order of the probate court showing that the same had been duly probated.

Mrs. Ellen E. Patton, the plaintiff, testified that she was twenty-nine years old. She had been married twice. She was married the first time to Steve L. Williams, and lived with him four years. She was divorced from Williams on March 4, 1924. The ground alleged by Williams for divorce was desertion. She first met A. H. Patton in June, 1923, at which time she was the lawful wife of Williams. She was engaged to Patton in the fall of 1923, before Christmas, while she was the wife of Williams. Patton was sixty-seven years old. After she and Patton were married, they went immediately to Hot Springs and stayed all night there. They then went to Little Rock and stayed four or five days, and then came back to her home, where they stayed all night. Her husband then insisted that she go with him to his home, and she told him that there was no place out there for her to stay. After they came back he went down on the farm and insisted on her going down there, and she said he didn't have any place to live. She didn't know when she

married him that the land wasn't in his name. She married him to take care of him. She was asked if she loved Patton, and answered that "she thought enough of him to take care of him."

O'Connor testified concerning the issue here involved substantially as follows: He had lived in Camden about 26 years, and was then engaged in the automobile business. He had known A. H. Patton about as long as he had lived in Camden. They were good friends —visited in each other's homes frequently, and were partners in a land deal. He had his home on a certain tract of land near Camden. The deeds executed to him were dated February 25, 1924. A man by the name of Diffie made them out. Witness was present when they were made out, but would not swear that he was present when they were signed. They were signed in witness' office. Witness was pretty sure he saw Patton sign them, although he would not swear to it. Witness thought he heard the notary take Mr. Patton's acknowledgment. Diffie worked for witness. Witness stated that he was not an expert on handwriting, and couldn't explain how it happened that part of the deed was filled out in pen and ink and part on the typewriter. Witness stated that he didn't know that where the name "Dan O'Connor" was written in the deed it was in witness' handwriting. He didn't know whether it was or not. He didn't believe that any man in the world could tell his own handwriting. Witness didn't think it was in his handwriting. It looked to witness like Diffie's writing. Patton gave witness the deeds on February 25, 1924. Witness didn't give him any property in exchange for it, and didn't remember for sure whether he had given him any money. He couldn't recollect. He would not swear whether he did or didn't give Patton $1, but he would swear that the deeds were made out completely like they are at the present, when they were given to witness by Patton. Witness could not remember the conversation that took place between him and Patton at the time the deeds were made. Witness was asked what reason Patton had for giving him

the deeds, and answered: "I don't know why; anybody could give a deed. The land belonged to him, and he could go ahead and deed it to whoever he wanted to." Witness didn't know whether he bought the land or whether it was a gift to him, but thought that Patton gave it to him. Witness believed that he filed the deeds for record the 21st of March, but didn't know for sure. Witness didn't record it before, because he didn't think it was anybody's business whether he recorded it then or whether he ever recorded it. Mrs. Patton and A. H. Patton were married on March 8. Witness never told Mrs. Patton, after her marriage to Patton, that he didn't have deeds to the property. Further along in his testimony witness was asked if he had any conversation with Patton, and answered, "I didn't have any—nothing more than he wanted to deed this land to me, and for me to go ahead and take care of it—deed this land to me just in case somebody was going to beat him out of it." Witness was asked who he thought was going to beat him out of it, and answered, "I don't know. He was kind of figuring on getting married. He thought if he did get married he would rather let me have it." Patton was married on March 8. He stated that he was figuring on two different women, and didn't know which one he would marry. He thought he might get married. He didn't want to be beat out of his land. Witness saw Patton every day after he gave witness the deeds, and saw him on the day witness placed the same of record. Witness on that day signed the other instrument designated in the record as an option. Witness gave Patton one and kept one. The instrument was executed in witness' office. Witness didn't remember where Patton was when he gave it to him, but he did deliver it to Patton at his request, so that, in case anything should happen to witness, Patton could have his land back. Witness further explained his relationship with Patton by saying that they had been friends for a long time, and anything witness could do for Patton he would do, and anything Patton could do for witness he would do. Patton always came to witness

for advice. Witness never solicited Patton to make him a deed to the land. The execution of the deeds to witness by Patton was voluntary on his part. Witness was asked what his attitude was in regard to a reconveyance to Patton, and stated, "Well, there was no agreement like that at the time, but, of course, it was mutually understood between us." Witness had that much confidence in Patton that he knew Patton would do that for him, and he would do the same for Patton without any question, as long as they both lived. Witness stated that the way he and Patton made the option contract, it was made for Patton personally. Patton was the only person to whom witness agreed to reconvey. Patton didn't pay witness anything for the execution of the option agreement. Witness stated that he was a careless observer of handwriting; about all the writing witness did was to sign his own name. Witness concluded his testimony on this branch of the case by stating that the deeds were executed to him because Patton wanted to make the deed to witness for fear some one was going to take the property away from him. It was mutually understood between them all the time that anything witness had Patton could get it, and anything Patton had witness wanted, witness could get it. Even witness' individual property, if Patton wanted it, witness would have conveyed it to him. After the deeds were executed, Patton wrote a will and signed the same in witness' presence. Witness wrote it at Patton's dictation. After the will was written and signed, witness gave it to Patton. One of the boys spelled his name L-o-u-i-s and one L-e-w-i-s. Patton's nephew's name was spelled L-o-u-i-s. Patton stated that he wanted his nephews named in the will. Witness could not say that Patton ever saw his two nephews. One of them lived in Amarillo, Texas, and if he ever lived in this community witness did not know it. Witness' memory is very poor, but he thought that he and a man named Sautur were present and witnessed the will.

Witness Diffie testified that he was a notary public, and took the acknowledgment of A. H. Patton to the

deeds in controversy on February 25, 1924. Patton did not say that he acknowledged the deeds for the consideration and purposes therein mentioned. Witness filled out the deeds conveying all the land. Witness was bookkeeper for O'Connor, and the deeds were filled out and the acknowledgment taken in O'Connor's office. Witness likewise took the acknowledgment of Patton's will. Sautur and O'Connor were present at the time Patton signed the will, and were present at the time each of the witnesses signed their names.

Intervener, Louis E. Patton, *née* Lucian Spaulding, offered oral testimony to prove that A. H. Patton, at a church gathering, received Lucian Spaulding, then eight years old, from a preacher representing the Home Society of Indiana, and publicly agreed to adopt the child, and then and there gave him the name of Louis Patton. The intervener offered also to show by witnesses who lived in the home of Patton at the time that Louis was living with him; that they saw A. H. Patton mail certain formal papers adopting the intervener; that, after these papers were mailed, A. H. Patton claimed that he had adopted the intervener, and demanded and received from him the love, respect and services of a son. By various other witnesses the intervener offered to prove that A. H. Patton had received Louis Patton, intervener, into his home and treated him as a son, and had publicly said that he had adopted him. By another witness the intervener offered to show that, a short time before A. H. Patton's death, he went to Marshall, Texas, where the intervener was then residing, and there stated that he had adopted the intervener and wished him to return to Arkansas to live, and that, in order to induce him to do so, he (Patton) would give the intervener whatever land he wanted—that the intervener was his adopted son and only heir, and would inherit all of his property. All of this testimony the trial court refused to consider.

Upon the above pleadings and testimony the trial court found the issues of law and fact in favor of the plaintiff Ellen E. Patton and the defendant Louis Patton

and ¡Walter Patton, and entered a decree canceling the deeds of A. H. Patton to O'Connor, dated February 25, 1924, and dismissed the intervention of Louis E. Patton for want of equity. The court found that the will of Patton had been duly probated, and that it named Louis Patton, Walter Patton, Mrs. Sallie Reynolds and Ellen E. Patton as its sole beneficiaries. The court found that A. H. Patton died without issue; that his widow, Ellen E. Patton, renounced the will and elected to take dower under the statute. The court thereupon entered a decree vesting in Ellen E. Patton a fee simple title to an undivided half interest in all the lands owned by A. H. Patton at the time of his death, describing them, which the court found was a new acquisition, and vesting the other undivided half interest in these lands in fee simple in Louis Patton and Walter Patton. The defendant O'Connor and Louis E. Patton excepted to the findings and decree of the court adverse to them, and duly prosecute this appeal.

1. We will first dispose of the appeal of the intervener, Louis E. Patton, née Lucian Spaulding. It is conceded, at least no testimony was offered to the contrary, that intervener was never legally adopted under the laws of Arkansas or Indiana. But the intervener alleged that he had been adopted by oral agreement of A. H. Patton, and that Patton had promised that at his death the intervener should inherit his property, and had promised to will him his property. Conceding, without deciding, that an oral contract for the adoption of a child and to give the same rights as a natural child may be enforced after the death of the foster parent, this doctrine could not avail Louis E. Patton under the pleadings and proof in this case, because A. H. Patton disposed of all the property of which he was possessed by will which was duly probated by judgment of the probate court. The uncontroverted testimony is that the Louis Patton mentioned in the will was the nephew of A. H. Patton; that the testator desired his nephew named in the will, which was done.

The doctrine on this subject is correctly stated as follows: "The implied covenant arising from a contract to adopt, not legally executed, where the child has fulfilled its part of the contract, is that the infant should receive a child's share of the estate of the foster parent. In case of intestacy that share is fixed by the statutes of descent and distribution, but, if there is a will, it is fixed by the will. The mere contract to adopt is not sufficient of itself to make the child a legal heir of the promisor, because the right to take as heir exists only by operation of law. The child takes in these cases by virtue of the contract and by way of damages or specific performance. An agreement to adopt does not prevent the person making the agreement from disposing by will of all his property to other persons than the child to be adopted; but an agreement, either express or implied, to give the adopted child a certain portion of the adoptive parent's property will be enforced." 1 C. J., p. 1377, § 21 (b). Our statute providing that, where a person makes a will and omits to mention the name of a child, if living, etc., he shall be deemed to have died intestate, and the child whose name is omitted shall be entitled to a child's portion of the estate, refers to natural children, or legally adopted children. The right of inheritance as such is conferred in our State upon a stranger in blood only by pursuing the special statutory proceeding for adoption. See *Morris* v. *Dooley,* 59 Ark. 483, 28 S. W. 30; *Chehak* v. *Battles,* 133 Ia. 107, 110 N. W. 330, 12 Am. Cas. 140.

But, even if it were conceded that a parol contract of adoption can be established in this State, the testimony offered by the intervener is not sufficient to prove that Patton contracted with him that he would inherit all of Patton's property, or that he (Patton) would will him all of his property at his death. While a person may enter into a valid and enforceable agreement to make a particular disposition of his property by will, the testimony offered by the intervener falls far short of establishing a contract capable of being enforced. "The burden is on the person claiming the benefit of an alleged

contract for adoption to establish it by clear, cogent and convincing evidence.'' 1 C. J., 1379, § 28, and cases cited in note. The contract alleged by the intervener was that he would inherit all of A. H. Patton's property; that ''he (Patton) would will him all of his property at his death.'' The intervener proved that, to induce him to return to Arkansas and live with A. H. Patton, Patton said he would give the intervener whatever land he wanted and that the intervener would inherit all of his property. But the intervener himself offered to testify that he did not, after his promise, return to Arkansas and live with Patton in his declining years. Therefore, his proffered testimony proves no contract capable of being enforced against Patton or his estate. The court ruled correctly in dismissing the intervener's complaint for want of equity.

2. The uncontroverted proof is that the deeds from Patton to O'Connor were executed and delivered by Patton to O'Connor on February 25, 1924. The undisputed testimony shows that these deeds were voluntary, at least the testimony of the grantee does not show that he paid any money for these deeds or that he gave anything of value for them. His testimony further shows that Patton stated that, at the time the deeds were executed, he deeded the land to O'Connor ''just in case somebody was going to beat him out of it. Patton was kind of figuring on getting married, and he thought if he did get married he would rather let witness have the land. He had two women in mind, and didn't know which one he would marry. He didn't want to be beat out of his land.'' This occurred on February 25, 1924, and Patton was married to appellee Ellen E. Patton on March 8, 1924, eleven days thereafter.

Learned counsel for the appellee Ellen E. Patton contend that these facts bring the case within the doctrine announced by this court in *West* v. *West,* 120 Ark. 500, 179 S. W. 1017, as follows: ''The general rule is that, if a man or woman convey away his or her property for the purpose of depriving the intended husband or wife of

the legal rights and benefits arising from such marriage, equity will avoid such conveyance or compel the person taking it to hold the property in trust for, or subject to, the rights of the defrauded husband or wife." And again, in *Roberts* v. *Roberts,* 131 Ark. 90, 198 S. W. 697, where we said: "That the wife's right of dower is a substantial property right, entitled to protection by the courts, is perhaps most strikingly shown in action by her to set aside conveyances made by the husband for the purpose of defeating her expectation (though not yet vested even as an inchoate right) of dower. If, shortly before a marriage, the future husband conveys away his real estate without consideration, and without the consent or knowledge of his betrothed, with the purpose and result of unfairly depriving her of dower, the courts will set aside the conveyance as a fraud upon her rights."

It is strongly urged by learned counsel for the appellant that the appellee cannot invoke the above doctrine in a court of chancery because her own testimony shows that, at the time she engaged herself to be married to Patton, she was the wife of Williams; that her conduct in thus engaging herself to Patton while yet the wife of Williams and marrying Patton four days after Williams obtained divorce from her, then, after living with Patton a few days, refusing to live with him any longer, causing him to institute a suit for divorce against her, proves that her marriage to Patton was not in good faith. The contention of counsel for appellant is sound. "He who comes into equity must come with clean hands", or, as it is sometimes expressed, "He that hath committed iniquity shall not have equity," is one of the cardinal maxims of equity. Says Mr. Pomeroy: "Whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any

remedy." 1 Pomeroy Eq. Jur., § 397, and numerous cases cited in note.

Now, Mrs. Patton's own testimony shows that she contracted to marry Patton while she was yet the wife of Williams, and that, a few days after she married Patton, she refused to live with him any longer. She refused to go to his home, stating that he had no place for her to live. While she states that she married him to take care of him, yet her conduct shows that she refused to live with him and to care for him. The only legitimate, and the irresistible, conclusion from her testimony is that she married him, not in good faith because she loved him and wanted to care for him, but solely for his property. Her own testimony proves that Patton, had he lived, would have been entitled to a divorce against her; and therefore, upon such divorce, she would have had no right to be endowed with any property which Patton had conveyed in anticipation of marriage. The doctrine announced in *West* v. *West* and *Roberts* v. *Roberts, supra,* cannot be invoked by one who shows that she entered upon the contract of marriage, not with a *bona fide* purpose of living with her husband and performing her marital duties and discharging the obligations of the marriage relation, but purely for the purpose of obtaining financial gain. Where husband and wife have thus each perpetrated a fraud upon the other, equity will close its doors against both, and will not allow either to enter its unsullied forum to assert and build rights upon the fraud of the other. It follows from what we have said that Mrs. Patton cannot maintain this action to cancel the deeds as a fraud on her marital rights, and likewise, the other appellees, who claim under A. H. Patton, cannot maintain their action to set aside the conveyance bottomed on the fraud perpetrated on the marital rights of Mrs. Patton.

3. This brings us to a consideration of the issue as to whether or not O'Connor holds the land in trust for the A. H. Patton estate. The deeds, on their face, are absolute conveyances. The testimony shows that they

were likewise voluntary conveyances, but, as against the parties and their privies, the question of consideration is immaterial. The owner of property who is *compos mentis* has the absolute dominion over it and may dispose of it as he sees fit, so long as he does not interfere with the existing rights of others; and, in the absence of fraud, accident, or mistake, no one can call in question a man's disposition of his property. 18 C. J. 162; 8 R. C. L. 961, § 35. Bump on Fraudulent Conveyances, p. 287, § 250. It is well settled under our statute, and by our decisions and the authorities generally, that an express trust cannot be engrafted by parol evidence upon a deed absolute in form. Section 4867, C. & M. Digest; *Bray* v. *Timms,* 162 Ark. 247-270, 258 S. W. 338, and cases there cited; *Leake* v. *Garrett,* 167 Ark. 415, 268 S. W. 608; *Gregory* v. *Bowlsby,* 88 N. W. (Ia.) 822, and cases there cited. But likewise, under our decisions (and the authorities generally) where there is fraud in the procurement of a conveyance, such conveyance, even though absolute upon its face, may be shown to create a trust. *Ammonette* v. *Black,* 73 Ark. 310, 83 S. W. 910; *Morris* v. *Nowlin Lumber Co.,* 100 Ark. 253-261, 140 S. W. 1; *Bray* v. *Timms, supra.*

In the last case, at page 274, we quoted the following from Mr. Pomeroy: "A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose, as, for example, the promise to convey the lands to a designated individual, or to reconvey it to the grantor, and the like, and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charted with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement." And again: "Whenever the

legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealment, or other undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances, which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interests." Measuring by the above standard, it is impossible to find anything in the conduct of O'Connor to justify the conclusion that he was a trustee *ex maleficio*. According to his testimony, which is all the testimony there is in the record on that subject, he did not perpetrate any fraud upon Patton in the procurement of the deeds. While O'Connor and Patton were intimate friends of long standing, O'Connor did not occupy any fiduciary relation to Patton. O'Connor did not exercise any undue influence over Patton to induce him to execute the deeds. On the contrary, the deeds were proposed, executed, and delivered by Patton to O'Connor without any solicitation or prompting whatever upon the latter's part. There are some inherent weaknesses in O'Connor's testimony; it is unique and peculiar in its manner of statement, and such as to challenge belief in some respects. Nevertheless, in the salient and essential features as to the execution, delivery and purpose of the deeds we do not feel justified in disregarding it. So far as the execution of the deeds is concerned, his testimony is corroborated by the testimony of Diffie, the notary public who took Patton's acknowledgment of his signature to the deeds. The testimony of O'Connor proves conclusively that the deeds to him were proposed, signed and delivered by Patton, *suo motu,* and because of the unbounded trust Patton reposed in him. True, the testimony of O'Connor shows that it was his purpose and the purpose of Patton that O'Connor should reconvey the lands to Patton at any time Patton might desire. But this was not a condition proposed by O'Connor or exacted by Patton; it was simply the mutual understanding because of the reciprocal trust and confidence each reposed in the other, according to O'Con-

nor's testimony. There is no testimony that Patton ever expressed a desire to have O'Connor reconvey the property to him. O'Connor testified that he always intended to reconvey the lands to Patton, if Patton had requested it, and would have done so without the execution of the written agreement designated "option." But Patton died without ever making such request.

Now, there is nothing in all of this testimony to warrant a finding that O'Connor was a trustee *ex maleficio*. The death of his friend and benefactor left O'Connor the absolute owner of the property, unless it can be said that his refusal to acknowledge that he held the lands in trust and to reconvey the same to the estate of Patton was sufficient to constitute him in law a trustee of such estate *ex maleficio*. Mr. Pomeroy says: "In order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the statute of frauds would be virtually abrogated; there must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute; it endeavors to prevent and punish fraud, by taking from the wrong-doer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts." 3 Pomeroy's Eq. Jur., p. 2412, § 1056. Certainly it cannot be said that the execution and delivery of these deeds to O'Connor was the result of a scheme on his part in order to obtain title in himself and defraud Patton. In *Acker* v. *Priest,* 61 N. W. (Ia.) 235, 239, speaking of the facts in that case, which are even stronger than in the case at bar, the court said: "He (the grantee) did not sustain such a fiduciary relation to the other parties as that he cannot, in perfect good faith, hold the title to the land, as the authorities before cited clearly demonstrate. Even had he taken title under an express promise to hold it in trust for his wife—which the evi-

dence shows he did not do—his denial of the trust, would not be such a fraud as to raise a constructive, trust, unless it be shown that such promise was part of a scheme to get the title in himself to defraud his wife."

And in *McClain* v. *McClain,* 10 N. W. (Ia.) 333, the facts were also stronger than those in the case at bar. The Supreme Court of Iowa in that case, among other things, said: "No fraud has been shown prior to or contemporaneous with the execution of the deed to defendant. His fraud consists in denying and repudiating his agreement to convey the land to plaintiff. However abhorrent this fraud may be in the eyes of honest men, yet it is not a ground upon which the case may be removed from the operation of the statute of frauds so that parol testimony may be admitted to establish the agreement creating the express trust." Such is the doctrine of our own cases. *Ammonette* v. *Black,* 73 Ark. 310, 83 S. W. 910; *Spradling* v. *Spradling,* 101 Ark. 451, 142 S. W. 848; *LaCotts* v. *LaCotts,* 109 Ark. 335, 159 S. W. 1111; *Ussery* v. *Ussery,* 113 Ark. 36, 166 S. W. 946; *Barron* v. *Stuart,* 136 Ark. 481, 207 S. W. 22; *Bray* v. *Timms,* 162 Ark. 247, 258 S. W. 38.

4. In regard to the instrument designated in the record as the "option," but little need be said. This "option" was without consideration moving from Patton. It was purely voluntary on the part of O'Connor, and while, under the circumstances, Patton, after the delivery of the same to him, might have exercised the option within a reasonable time from its execution and delivery, nevertheless it was purely personal to him, and he died without claiming its benefits. No one could succeed to his rights under it. Being without consideration, and with no time specified for its exercise, it was simply a mere offer on the part of O'Connor to Patton, and O'Connor had the right to withdraw it within a reasonable time after Patton had been given notice and an opportunity to exercise the same. See *Hogan* v. *Richardson,* 166 Ark. 381, 266 S. W. 299; 6 R. C. L. 603, § 25, and cases cited.

The decree of the chancery court is therefore reversed, and the cause is remanded with directions to dismiss for want of equity all complaints challenging the title of O'Connor to the lands in controversy.

Mr. Justice HART dissents.