LADD *v.* BONES.

4-8617 214 S. W. 2d 353

Opinion delivered November 1, 1948.

*Robert A. Zebold,* for appellant.

*T. S. Lovett, Jr.,* and *G. D. Walker,* for appellee.

ED. F. MCFADDIN, Justice. Appellee filed suit to have Mr. E. P. Ladd declared a constructive trustee; and the chancery court so decreed. This appeal questions the correctness of that holding, and also presents the other questions hereinafter discussed.

I. *Was Mr. Ladd a Constructive Trustee?* Since each case involving a constructive trustee is necessarily to be determined in the light of its own particular facts, we set forth the facts in this case in considerable detail. Caswell Bunton (colored) died intestate in 1924, the owner of the 114 acres of land here concerned. His five

children and heirs were all adults, being Sarah Williams, John Bunton, Mary Bunton Smith, Luzelia Bunton, and Eddie Bunton. All the heirs were nonresidents except Sarah Williams and John Bunton. These two undertook to hold the property for themselves and their co-tenants. In addition to State and County taxes, the lands were subject to Improvement District taxes in (a) Cousart Bayou Drainage District, (b) Southeast Arkansas Levee District, and (c) No Fence District No. 2.

Sarah Williams, a Negress—now over 62 years of age—was the representative of the other heirs. For several years she paid the taxes and assessments on the lands; but in 1928 and subsequent years the lands became delinquent to the various taxing agencies. In 1933, Cousart Bayou Drainage District purchased the lands at its foreclosure sale for the delinquent assessments of 1928, 1929 and 1930 in that district. The Levee District and the No Fence District likewise foreclosed and purchased for their delinquent assessments. The lands also forfeited for the State and County taxes of 1929 and 1930. Although the time for redemption had expired, it was the policy of the Cousart Bayou Drainage District—and apparently also the policy of the other districts—to show the delinquent landowners all possible leniency.

That Sarah Williams was trying all the time to save the lands is shown by ample evidence. On November 9, 1936, Sarah went to see Mr. A. F. Triplett of Pine Bluff, who was the attorney for the Cousart Bayou Drainage District, to discuss with him the delinquencies on this land. Mr. Triplett agreed with her that the Cousart Bayou Drainage District would settle all of its delinquent items—including the foreclosure sale and the purchase title—for the sum of $400. Then Sarah went to see Mr. Walter White to obtain a loan from him in order to save the lands. Mr. White professed inability to make the loan, but agreed to consult Mr. E. P. Ladd to see if he would advance Sarah the necessary money.

Mr. White did see Mr. Ladd; but Mr. White and Sarah Williams have entirely different understandings as to what Mr. White reported to Sarah. Sarah testified

that she understood, from what Mr. White told her, that Mr. Ladd would clear up all the tax delinquencies, and would hold possession of the land until the rents repaid him all of his expenditures for taxes, improvements and interest; and then he would return the land to Sarah for herself and her brothers and sisters. Mr. White testified that Sarah wanted Mr. Ladd to have the land for the delinquent taxes, rather than for some other person to obtain the land. At all events, Sarah remained on the land until Mr. White wrote her a note on January 11, 1937, reading: "Sarah: You can go ahead and move if you want to. Mr. Ladd has paid everything off on the 114 acres of land. So you can rest easy now, and Johnnie will have to pay rent if he stays there." Sarah moved from the land after receiving this note, and Mr. Ladd took charge and remained in possession thereafter.

Mr. Ladd's acquisition of the legal title was accomplished by obtaining a deed * to him from the Cousart Bayou Drainage District on January 9, 1937, and then using that title as a basis for redeeming from the forfeiture to the State, and also for redeeming from the forfeitures to the Levee District and the No Fence District. In short, it was the acquisition of the legal title from the Cousart Bayou Drainage District by deed dated * January 8, 1937, that made it possible for Mr. Ladd to redeem from the other taxing agencies.

As previously stated, Mr. A. F. Triplett was the attorney for the Cousart Bayou Drainage District. Mr. Triplett testified of his conversation with Sarah, prior to Mr. Ladd's deed: "I told Sarah Williams at all times that the Drainage District did not want to see any property owner lose his property for taxes, and that we would do everything within reason to prevent such a result, including the acceptance of partial payment and the granting of any reasonable period to pay the amount due."

In response to the question, "Under what terms of agreement, if any, was this property conveyed to Mr. Ladd by the district?", Mr. Triplett said: "Mr. Ladd

---

* The deed was dated January 8th, but appears to have been delivered January 9th.

came to my office somewhere around the 1st of January, 1937, and offered to buy the district's title to the Bunton property for $400. He stated that he was making the offer upon behalf of the Buntons and would deed the property back to them if they paid him back his money. The district had a great deal more than $400 in the property; but since I had tried repeatedly to get the Buntons to redeem without any payment whatever being made, and since I had received the information that members of the family other than Sarah Williams, and especially John Bunton, had been advised that he could beat the drainage tax, and since the annual tax on this property was approximately $100, and Mr. Ladd stated that he was buying it on behalf of the owners, and since the property had been sold to the district since March 6, 1933, I concurred with the Board in the view that it would be better to accept the $400 and get the property back on the tax books. I therefore closed the deal with Mr. Ladd on the basis of $400 on January 9, 1937."

Mr. Triplett further said: "There could have been no question in the minds of either Mr. Ladd or myself as to the terms upon which he was buying the property."

Sarah testified that in 1939 she asked Mr. Ladd about the place; and that he said that he still lacked $500 of having all of his money, but that he had the place rented for 1940 and 1941, and that he said, "All I want is my money." In December, 1941, Sarah again went to see Mr. Ladd; and she testified that he then told her, for the first time, that he was claiming the property as his own. In March, 1942, this suit was instituted to have Mr. Ladd declared a constructive trustee. As previously stated, the Chancery Court held that Mr. Ladd was a constructive trustee, and the question now under consideration is whether that holding is correct.

We have a vast number of cases involving attempts to have the holder of a legal title held to be a constructive trustee. In some of the cases, the trust was declared; in others, it was denied. The question here is, on which side of the line this case falls. Each side cites many other cases, but we list the following as typical. Appellant

1034

says the facts here are more similar to cases like *Ammonette* v. *Black,* 73 Ark. 310, 83 S. W. 910; *Spradling* v. *Spradling,* 101 Ark. 451, 142 S. W. 848; and *LaCotts* v. *LaCotts,* 109 Ark. 335, 159 S. W. 1111; in each of which the trust was denied. Appellee says that the facts in the case at bar are more similar to cases like *Strasner* v. *Carroll,* 125 Ark. 34, 187 S. W. 1057, Ann. Cas. 1918E, 306, and *Holman* v. *Kirby,* 198 Ark. 326, 128 S. W. 2d 357, in each of which the trust was declared.

After careful consideration, we reach the conclusion that this case is more similar to the latter cases than the former; and that the Chancery Court was correct in decreeing the trust. Sarah Williams retained possession until assured that Mr. Ladd had the deed, and that she could "rest easy." Until that instant, she retained her possession, and continued her efforts to obtain funds from others with which to redeem the property. She was, by that assurance, lulled into a feeling of security that her property was not lost. Furthermore, the testimony of Mr. Triplett makes certain the fact that the District would not have conveyed the property to Mr. Ladd, except for Mr. Ladd's representation that he was acting for Sarah Williams' benefit. Mr. Ladd's 1941 refusal, and his verified answer of denial (filed as a pleading in this case) show that the statements made to Triplett were a species of constructive fraud sufficient to call into action equity's power to decree a trust. In *Strasner* v. *Carroll,* 125 Ark. 34, 187 S. W. 1057, Mr. Justice HART, quoting from another case, said:

" 'There is another class of cases growing out of the conduct of debtors and purchasers at public sales. This is where the purchaser becomes such under a state of facts as would make it a fraud to permit him to hold on to his bargain. As if a purchaser, by means of a promise to reconvey to his debtor. should induce a relaxation of the efforts on his part to prevent a sacrifice of his property, and thereby obtain it at an under price, or, if the purchaser, taking advantage of that reluctance invariably manifested by those attending public sales to interfere with any arrangement a debtor makes to save his property, should create an impression that he was buy-

ing for the debtor, thereby preventing competition, or by any other improper means obtain the property of a debtor at a sacrifice, such conduct would convert the purchaser into a trustee for the benefit of those who were defrauded by his conduct. Such cases go upon the ground of fraud, and courts will give relief without regard to the circumstance whether the agreement was a written or a verbal one, or whether it was supported by a consideration or not. Such are the cases of *Rose* v. *Bates,* 12 Mo. 30; *Estill* v. *Miller & Estill,* 3 Bibb. 177.' See, also, *Leahey* v. *Witte,* 123 Mo. 207, 27 S. W. 402. The same rule applies where the promisee relaxed his efforts to save the property from being sold at the judicial sale. *Arnold* v. *Cord,* 16 Ind. 177; *Lillard* v. *Casy,* 2 Bibb, (Ky.) 459. As bearing on the subject as sustaining the rule where the facts warrant it, see *Patrick* v. *Kirkland,* 53 Fla. 768, 43 So. 969, 125 Am. St. Rep. 1096, 2 Ann. Cas. 540, and case note to 5 A. & E. Ann. Cas. at p. 173; Perry on Trusts (4th Ed.), Vol. 1, § 215, and *Ryan* v. *Dox,* 34 N. Y. 307, 90 Am. Dec. 696.''

From the evidence detailed, and from other facts and circumstances in the record, we hold that the evidence meets the test of ''clear, convincing and satisfactory'' as is required to support such a trust. See *Davidson* v. *Edwards,* 168 Ark. 306, 270 S. W. 94.

II. *Appellee's Right to Maintain the Suit.* Appellant challenges the appellee's right to bring the original suit. We discuss this contention, although it does not appear to have been presented in the lower court. When Sarah Williams learned in December, 1941, that Mr. Ladd denied the trust status, she and John Bunton executed a deed to appellee Joe Bones—son-in-law of Sarah Williams; and Bones filed the suit against Mr. Ladd, setting up the full history of the title and the heirship. Sarah Williams subsequently intervened in the case. It was shown that Sarah Williams and her brother, John Bunton, were not claiming adverse to their co-tenants; and that the deed to Joe Bones was because of some peculiar idea of the correct way to bring the suit. The deed was without monetary consideration. So, we treat the case here as though the appellee is acting for all the heirs of

Caswell Bunton. Sarah Williams was a party to the record, and she testified that she was acting for all of the heirs. The determination of the rights of the heirs *inter sese* is not before us.

III. *Admissibility of Sarah Williams' Testimony.* Appellant insists that the testimony of Sarah Williams, as to her dealings and conversations with E. P. Ladd, is inadmissible because of § 5154, Pope's Digest, which—under circumstances therein stated—prevents a party from testifying as to transactions with a testator or intestate. This suit was originally filed in March, 1942, by Joe Bones against E. P. Ladd. Sarah Williams intervened, and adopted the allegations of the complaint against Ladd. During the pendency of the litigation, Ladd died testate, and R. A. Zebold was appointed administrator with will annexed of Mr. Ladd's estate. This suit was revived against Zebold, as administrator, and also against the widow and son of E. P. Ladd. Sarah Williams' deposition was taken while the administrator was a party to the suit. Later the administration of E. P. Ladd's estate was closed, and the property vested in the widow and son of E. P. Ladd; and Zebold, as administrator, ceased to be a party to this suit. Such was the status of the parties, and the record, when the cause was heard by the chancery court.

The objection to the admissibility of Sarah Williams' testimony must be determined as of the time of the trial in the chancery court, and not as of the time of the taking of her deposition. See *Park* v. *Lock,* 48 Ark. 133, 2 S. W. 696; *St. L. I. M. & S. Ry. Co.* v. *Harper,* 50 Ark. 157, 6 S. W. 720, 7 Am. St. Rep. 86. See, also, 18 C. J. 744. Under our cases, as just cited, Sarah Williams' testimony was admissible at the time of the trial in the chancery court; because, at that time, only the widow and son were parties defendant, and the inhibition of § 5154 of Pope's Digest does not apply when the widow and heirs are the only opposing defendants. See *Lawrence* v. *LaCade,* 46 Ark. 378.

The decree of the chancery court is affirmed.