JAMES E. WILKS v. A. O. LANGLEY, ADM'R ET AL

5-5184                                              451 S. W. 2d 209

Opinion delivered March 9, 1970

*Sloan & Sloan,* for appellant.

*T. A. French* and *Kirsch, Cathey & Brown,* for appellees.

J. FRED JONES, Justice. Mr. and Mrs. I. B. Langley died intestate and without issue as a result of injuries sustained in an automobile accident on December 12, 1968. Mrs. Langley was killed instantly and Mr. Langley died a few days later. A. O. Langley, a brother of the decedent, filed a petition in probate court for the appointment of a personal representative and letters of administration were issued to him. James E. Wilks also filed a petition in the probate court alleging that I. B. Langley agreed to adopt him and to all intents and purposes did adopt him. He alleged that he is the legally adopted son and sole surviving heir of the Langleys, and prayed that he be declared the legally adopted child of I. B. Langley and Hattie Langley and entitled to inherit the entire estate of both decedents.

Wilks alleged in his petition, and contended in his argument, that if there was no formal adoption, that there had been "virtual adoption" and that a "virtual adoption" has the same legal effect as statutory adoption. Wilks contended that if there was no "virtual adoption" then the cause should be transferred to chancery court for the specific performance of the alleged agreement to adopt him. The matter was transferred to chancery court where Wilks' petition was dismissed for want of equity. On appeal to this court he relies on the following points for reversal:

"The court should have found there was an agreement for adoption and failure to so find is against the preponderance of the testimony; contrary to the law and the proof herein.

The court erred in failing to find there was a

virtual adoption and this court should establish the doctrine of virtual adoption and hold that the testimony in this case is sufficient to establish that James Eddie Wilks was virtually adopted by Mr. and Mrs. I. B. Langley."

We find no merit in the appellant's first point. There is simply no proof in the record that the Langleys ever entered into an enforceable agreement to adopt the appellant. The appellant was the second of twelve children born to Mr. and Mrs. Sterling Wilks. He went to live with the Langleys when he was about two years of age. The evidence indicates that the Langleys reared him as if he were their own son, but the record falls far short of evidence supporting an enforceable agreement by the Langleys to adopt the appellant.

Sterling Wilks, the father of the appellant, testified that when Mr. Langley first took the appellant, Langley stated that he would just like to keep Eddie all the time, and that he, Wilks, agreed.

"Q. . . . after Mr. Langley came the second time and got Eddie did you and him ever have any other discussions about what disposition would finally be made about the custody of Eddie?

A. No, other than any time anything was ever said he would continue on, he wanted to take him and feed him and clothe him and educate him.

Q. Did he say anything about adopting him?

A. We continued on talking quite awhile and he made the remark to take the boy and keep him, clothe him and educate him and I said: 'After all you have all got a child, a boy, now you have one you can do a better part by him, go ahead and keep him.'

Q.  Did he say anything about adopting him?

A.  He mentioned about adopting him, yes.

Q.  What did he say about it?

A.  He just wanted to know about adopting the child. I don't know anything about papers being fixed up, so far as I know, so far as he was concerned he could go ahead and keep him."

Mrs. Alice Wilks, the mother of the appellant, testified that Mr. Langley came to their house when the appellant was quite young and picked him up and said: "I love this boy, why don't you give him to me."

"Q.  . . . was there ever any conversation between you and Mr. Langley about how long they have Eddie or whether they would adopt him or anything of that kind?

A.  Mr. Langley said that at one time 'I would like to take this boy and raise him.' Said, 'I love him and I can give him things.' I said: 'I know you can give him things I would never be able to.'

Q.  Did he say anything else?

A.  That's all I can remember he said right then.

Q.  Did you have any other conversation about them keeping him?

A.  Well, they have asked me several times to adopt him, you know, take him and raise him.

Q.  Mrs. Wilks . . . tell the court about the last conversation that was had with Mr. Langley

about the adoption?

A.   Him and Mrs. Langley came out to our house one time, we lived on the Lempkin place, and Mr. Langley came out in the yard and him and Lemp [Mr. Wilks] went out figuring around and they came back in and he says, 'this is my boy, I love him, he is my boy.'

Q.   What else did he say?

A.   He says we are going to take him home with us.

Q.   Did he say anything else?

A.   I don't remember anything else. We was all in ther laughing and talking.

Q.   Tell the court whether or not he said anything about he was going to take him and adopt him?

A.   Well, he would have, yes.

Q.   Did he?

A.   He wanted to adopt him.

Q.   Did he agree to?

A.   Yes."

Mrs. Lena James, who had lived near Mr. and Mrs. Wilks, and who was 87 years of age, testified that she remembers very distinctly hearing Mr. Langley state: "I don't want to adopt Eddie until he is more mature so it would be pleasing to all." She says this occurred when Eddie was about 12 years of age.

The appellant testified that he was born on No-

vember 24, 1939, and that he was first taken to the Langley home when he was about one year old. He says he remembers being taken to the Langley home but that he was about five years of age before he knew that the Langleys were not his natural parents.

Under date of May 11, 1969, Mr. and Mrs. Sterling Wilks signed a written statement that Mr. Langley mentioned a few times that they might adopt appellant but that it never got beyond discussion; that the Langleys never did ask them to sign any papers, and that they never did ask or demand that the Langleys adopt the appellant; that the Langleys never did promise to adopt the appellant even though the subject was mentioned a few times. We are of the opinion that the chancellor's finding that there was no agreement for adoption is not against the preponderance of the evidence.

As to appellant's second point, inheritance under the theory of "virtual adoption" is unknown to the law of Arkansas. Ark. Stat. Ann. §§ 56-101 through 56-120 (Repl. 1957 and Supp. 1969) set out the only method of adoption in Arkansas. It is by force of § 56-109 that an adopted child inherits at all from adoptive parents in Arkansas, and that section reads as follows:

"(a)  Upon the entry of the final decree of adoption the natural parents of a child shall be divested of all legal rights and obligations due from them to the child or from the child to them; except that if the petitioner be married to the natural father or mother of the child, then said natural parent shall not be divested of any rights or obligations, but both the natural parent and the adopting parent shall have all the rights and be subject to all the obligations with reference to such child that natural parents have or are subject to under the laws of this State.

(b)  The adopting parents shall have every legal

right in respect to obedience on the part of the child, and such adopting parents, their heirs and next of kin shall have the right of inheritance and distribution of the real and personal estate of the child or its decedants [descendants] and the right of recovery for the death of the child by wrongful act, as if the child had been born to the parents in legal wedlock; except that the right of inheritance and distribution shall not extend to any ancestral estate, real or personal, which shall have come to the child or its descendants through the natural parents of such child.

(c) The person adopted shall have every legal right, privilege and obligation and relation in respect to education, maintenance and the rights of inheritance to real estate or the distribution of personal estate on the death of the adopting parents as if born to them in legal wedlock.

(d) Nothing in this act [§§ 56-101—56-113, 56-115 —56-120] shall be construed as debarring a legally adopted person from inheriting property from its natural parents or other kin."

There is ample proof in the record that the Langleys treated and reared the appellant as they would have their own son, and that the appellant treated them as a son should treat his parents. But, whatever commendable virtues may have prompted the mutual respect, admiration and appreciation the appellant and the Langleys had and demonstrated for each other, such attitudes and treatment did not arise from a legal duty owed under the statutes of Arkansas or under an enforceable promise to adopt.

It may well be conceded in this case that the Langleys gave to the appellant far more than they were legally obligated to give, or he was legally entitled to demand. It may also be conceded that the appellant reciprocated with the love, respect and devotion a dutiful son should show and feel toward his parents, but

such affection and treatment does not create property rights not endorsed by statute in this state. The appellant was made beneficiary of a savings and loan account in the amount of $22,752.73, and there is no reason appearing in the record why the Langleys could not have, or would not have, carried out the rather simple statutory adoption procedures if they had desired and intended that the appellant should inherit from them as their only child and sole surviving heir at law. Such relationship is not created in Arkansas by mere amiable association or even by desire and intention. Had the Langleys desired and intended that the appellant should share in their property to a greater extent than the savings and loan account they provided for him, they could have accomplished this by will, as well as by adoption.

This case is similar to *Stanley* v. *Wacaster*, 206 Ark. 872, 178 S. W. 2d 50, where suit was brought to enforce a contract of adoption, and there too, the petition was dismissed because the testimony failed to show an enforceable agreement to adopt.

The case of *Thomas, Adm'x* v. *Costello*, 226 Ark. 669, 292 S. W. 2d 267, involved a so-called equitable adoption, and in that case we said:

"The evidence reveals that appellee was never adopted by Mrs. C. C. (Barry) Costello, in the manner as provided by statute, Sections 56-101 to 56-120, inclusive, Ark. Stats. 1947. Mrs. Costello reared and held the appellee out as her natural son. However, no evidence was introduced to prove that Mrs. Costello ever agreed to adopt appellee. Our court has many times held that in an attempt to prove a contract to adopt a person, the burden of proof rests with the person claiming the benefit of an alleged contract for adoption, to establish it by clear, cogent and convincing evidence. *Stanley* v. *Wacaster, Administrator*, 206 Ark. 872, 178 S. W. 2d 50; *O'Connor* v. *Patton*, 171 Ark. 626, 286 S. W. 822.

The Chancery Court is without authority to declare appellee an heir of Mrs. C. C. (Barry) Costello, by equitable adoption. This court held in *Cooper* v. *Bradford,* 196 Ark. 327, 117 S. W. 2d 719 that: 'The mere contract to adopt is not sufficient of itself to make a child a legal heir of the promisor, because the right to take as heir exists only by operation of the law.'"

As pointed out in *O'Connor* v. *Patton,* 171 Ark. 626, 286 S. W. 822:

"The mere contract to adopt is not sufficient of itself to make the child a legal heir of the promisor, because the right to take as heir exists only by operation of law. The child takes in these cases by virtue of the contract and by way of damages or specific performance. An agreement to adopt does not prevent the person making the agreement from disposing by will of all his property to other persons than the child to be adopted; but an agreement, either express or implied, to give the adopted child a certain portion of the adoptive parent's property will be enforced. 1 C. J., p. 1377, § 21 (b)."

In *Minetree* v. *Minetree,* 181 Ark. 111, 26 S. W. 2d 101, the petitioner attempted to claim a share in an estate as an adopted pretermitted child. The chancellor held that the adoption was bad because the petition therefor failed to set out the particular district in Mississippi County in which it was filed. In affirming the decree of the chancellor, we said:

"The right of inheritance as such is conferred in our State upon a stranger in blood only by pursuing the special statutory proceeding for adoption."

In the case of *Cooper* v. *Bradford,* 196 Ark. 327, 117 S. W. 2d 719, Bradford reared Cooper from babyhood and died intestate. Cooper first claimed the Bradford estate in probate court as an adopted child, but later moved in chancery court to enforce an alleged

agreement to adopt. Witnesses testified that Bradford had said that he had adopted Cooper and that his estate would go to Cooper. About as many testified that Bradford told them he had never adopted Cooper and that he had done for him all he intended to. The chancellor found against Cooper and in affirming the chancellor, this court said:

> "One who seeks to recover under an alleged contract to adopt has the burden of establishing the contract by clear and convincing evidence. The rule is stated in 1 C. J., p. 1379, § 28, as follows:
>
> 'The burden is on the person claiming the benefit of an alleged contract for adoption to establish it by clear, cogent and convincing evidence.' "

The evidence in the case at bar did not measure up to the test laid down in the above cases and the decree of the chancellor must be affirmed.

Affirmed.